94

No. 31,522

CLAY H. NEWELL, *Appellant,* v. WILLIAM M. MCMILLAN and MAG-GIE T. MCMILLAN, *Appellees* and *Cross Appellants,*

and

WILLIAM M. MCMILLAN, MAGGIE T. MCMILLAN, and DUANE BLACK-BURN MCMILLAN, by WILLIAM M. MCMILLAN, his Guardian, *Appellees,* v. CLAY H. NEWELL, *Appellant,*

and

WILLIAM M. MCMILLAN, MAGGIE T. MCMILLAN and MEADE STAN-TON MCMILLAN, *Appellees,* v. CLAY H. NEWELL, *Appellant.*

(Consolidated)

(30 P. 2d 126.)

Opinion filed March 10, 1934.

*C. M. Williams, D. C. Martindell* and *W. D. P. Carey*, all of Hutchinson, for the appellant.

*C. W. Slifer, Robert Garvin, Evart Garvin* and *Morris Garvin*, all of St. John, for the appellees and cross appellants.

The opinion of the court was delivered by

DAWSON, J.: These three cases, which were consolidated and tried together in the district court, grew out of the leasing of some Stafford county lands for gas and oil development and out of the lessee's neglect to cancel those leases of record upon his failure to develop or pay rent.

It appears that on and prior to April 6, 1926, William M. Mc-Millan and wife were the owners of considerable land in Stafford county which they determined to convey, subject to reservations, to their two minor sons, Duane and Meade. Accordingly certain deeds were executed and dated April 6, 1926, in the *first* of which the grantors conveyed certain described lands aggregating 160 acres (less railway right of way) to their son, Meade Stanton McMillan, with the following reservations:

"The grantors hereby reserve a life estate in, and the landlords share of earnings and returns from above described real estate.

"The right to mortgage, sell or otherwise dispose of said real estate by grantee, is hereby forever reserved by said grantors. In the event ·of the death of said grantee, title is to pass to the children of said grantee. If grantee leaves no living issue said title is to revert and vest in the heirs of said grantors."

A *second* deed, for 160 acres described, was executed in favor of their son, Meade Stanton McMillan, with a reservation similar to the first.

A *third* deed, for 480 acres described, was executed in favor of Duane Blackburn McMillan, with a reservation like the one quoted above.

A *fourth* deed, for 100 acres described, was executed in favor of Duane Blackburn McMillan, with a reservation which read:

"Grantors hereby reserve a life estate in, and the landlords share of all the earnings and returns from above described real estate.

"The right to mortgage, sell or otherwise dispose of the within described real estate is hereby reserved by the grantors, until said grantee shall have attained the age of forty years."

In 1930 there arose a demand for oil and gas leases in the locality where these lands lay, and on July 7, 1930, McMillan and wife, and McMillan as guardian of his minor son Duane, executed to Clay H. Newell three separate leases to certain tracts of the lands which had theretofore been conveyed (subject to reservations) to Duane Blackburn McMillan. And on the same day, McMillan and wife, and McMillan as guardian of his minor son Meade, executed to Clay H. Newell two oil and gas leases covering separate tracts which had theretofore been conveyed (subject to reservations) to Meade Stanton McMillan.

The leases were in the usual form of oil and gas leases—to endure for ten years or as long as gas or oil was produced thereon, with one-eighth royalty to the lessor, or one dollar per acre per annum as rental if development was deferred, and providing for termination for breach of the leasing terms.

In the litigation which followed it was alleged and admitted that on the delivery of these leases Clay H. Newell paid to the lessors the sum of $1,095, being $1.50 per acre, as the primary consideration therefor.

No prospecting for oil and gas followed the execution and delivery of the leases, and neither did the lessee pay the stipulated annual rent for deferred development. The lessee, however, did record the leases on March 3, 1932, after they had been terminated by their express terms.

On August 4, 1932, the first of these three actions was begun by Newell, the lessee, against the lessors; and in an amended petition filed October 8, 1932, he pleaded the facts above stated and alleged that he had purchased the five leases for an aggregate sum of $1,095, being $1.50 per acre, which he paid to lessors; that his purpose in purchasing the leases was for resale to companies engaged in the

development of oil and gas, and that such purpose was well known to the lessors; that the leases expressly recited that the lessors warranted and agreed to defend the title to the leased lands; that the lessors represented to plaintiff that they were the owners of the lands and had the right and power to execute leases thereof; and that the plaintiff lessee relied on those representations and did not require an abstract of titles nor investigate the titles to determine the truth of such representations.

Plaintiff Newell further alleged that he entered into a contract with the Gypsy Oil Company for the sale and assignment of one of the leases covering 160 acres at $5 per acre subject to an abstract of title showing a good and merchantable title in the lessors, but that the sale failed because of the condition of the title. He further alleged that he contracted to sell and assign another of the leases covering 160 acres for $840, and another covering 160.64 acres for $790.86, and the remaining two leases for more than he paid for them; but that all of these contracted sales failed because of the condition of the title. Plaintiff further alleged that he notified the lessors that the condition of the title was preventing the sale of the leases, and that McMillan filed a proceeding in the probate court praying for authority to lease the lands he and his wife had conveyed to their minor son Meade, and instituted a similar proceeding in the same court for leave to lease the lands McMillan and wife had conveyed to their minor son Duane. Such authority was granted; but upon an inspection of the probate proceedings plaintiff's prospective purchasers declined to buy on account of the condition of the title.

Plaintiff alleged that the damages he had sustained by reason of the defective condition of the titles, as above stated, included the sum of $1,095 which he had paid for the leases, $150 which he had paid for the probate proceedings, and $3,000 for loss of profits on negotiated sales of the leases—a total of $4,246, for which he prayed judgment. Copies of the deeds to the minor sons, of the probate court proceedings, and of the leases were attached to plaintiff's petition.

Defendants' demurrer to the amended petition was overruled, and they answered with a general denial, but admitted the execution of the deeds to the minor sons, the execution of the leases, and the facts alleged concerning the probate court proceedings, and the receipt of $1,095 from plaintiff. The answer also alleged that the

probate court had jurisdiction of the minors and of their estates and of the subject matter of the proceedings, and alleged that those proceedings were regular and in due form.

It was also alleged in the answer that when plaintiff Newell and his agent Watson began negotiations with the defendants to obtain leases on these properties, defendants fully advised plaintiff and his agent of the condition of the title, and that plaintiff and his agent Watson undertook to procure the proper probate court proceedings in respect to the estates of the minors, Meade and Duane McMillan, so that good and sufficient leases could be executed, and that plaintiff Newell agreed to pay all expenses incident thereto.

Defendants further alleged that pursuant to the above agreement Newell and his agent Watson caused the papers to be prepared and the probate proceedings to be instituted and prosecuted to conclusion, and thereafter informed defendants that they (the lessors) had full authority to execute the leases for their minor sons, and that defendants relied on these statements of Newell and Watson.

Defendants further alleged that the titles of the leased properties had never been attacked nor the lessee's rights thereunder interfered with, nor had he been prevented from entering on the leased lands for the purpose of drilling and exploring for oil and gas. It was further alleged that by reason of the lessee's failure to develop and his failure to pay the stipulated annual rental for delaying development, the leases had expired by their terms on July 7, 1931.

Plaintiff's reply traversed most of the allegations of the answer and contained some further allegations of no present consequence.

While the issues in the foregoing action were being joined, McMillan and wife and McMillan as guardian of his minor son Duane, served on Newell the statutory notice of forfeiture of three of the leases (on Duane's lands) for failure to develop and failure to pay the stipulated amount for postponement of development and demanded that the lessee execute their proper cancellation of record. This notice and demand were ignored and the lessors filed an action for the statutory damages ($100 on each lease) and for an attorney's fee.

A similar notice relating to the lessee's delinquency in respect to the two leases on Meade's lands was similarly ignored, and an action was begun for the statutory damages and an attorney's fee.

In each of these actions defendant Newell answered, pleading the facts of the leasing, alleging the failure of the lessors to give good

and merchantable title to the leased premises, the consequent frustration of profitable sales of the leases, and alleging that he was ready and willing at all times to comply with all the terms of the leases if the lessors had delivered good and merchantable titles thereto. Defendant Newell also pleaded the pendency of his action against the lessors, and that the issues tendered in these later sections were involved in the prior pending action and should be litigated in it.

Defendant further alleged that by reason of the failure of the lessors to give good and merchantable title he was under no obligation to discharge the record unless and until the lessors returned to him the sum of money he had paid them therefor and such damages as he had sustained by the alleged breaches of warranty.

On motion of Newell, the three actions were consolidated for trial, and they were tried by the court without a jury. Some of the pertinent facts were agreed to by counsel for the litigants. The oral testimony developed some dispute of facts touching the representations and statements of the parties at and prior to the making of the leases, but the trial court reached its judgment in all three cases without depending on such controverted details, and no motion was filed by either side that specific findings of fact be made.

In the first action the court held that the lease covering the 100 acres described in the *fourth* deed was valid and conveyed good and merchantable title to the lessee, but because of the reservations made in the *first, second* and *third* deeds of the grantors to the minor grantees, the titles were doubtful, and in consequence the leases were not merchantable, and that the lease contracts fairly implied a warranty of merchantable title. The court concluded that Newell was entitled to damages in the sum of $945, being the amount paid for the five leases less $150 for the one held valid.

The trial court gave judgment in favor of the lessors in each of the cases founded on the statute for the lessee's failure to discharge the leases of record—awarding the statutory damages of $100 for each of the five leases, and $100 attorney's fee in each of the two cases, a total of $700. This sum was offset against the judgment of $945 awarded to Newell in the first action, resulting in a net judgment in his favor for $245. Costs in the first case were taxed against the lessors, and against the lessee, Newell, in the two later cases.

Motions for a new trial filed by all parties were denied. Newell appeals in all three cases, and the lessors file a cross appeal in the first case.

Before considering the errors assigned in the appeal and the cross appeal, it may shorten our task to state briefly the main contentions of the parties.

Newell, appellant, contends that owing to the reservation in the deed to 100 acres which McMillan and wife conveyed to their son Duane, the lease on that tract of land was subject to the same infirmities of title which the trial court, held to be so doubtful as to render them not merchantable. Newell also contends that because of the questionable titles and because he had instituted an action against the lessors on account of their alleged breaches of warranty of title he was not liable to the statutory penalties for failure to discharge the leases of record.

The cross appellants contend, in brief, that there was nothing substantial the matter with the titles to the leased properties, and that the trial court erred in holding unmerchantable the titles to four of the leased properties.

Before analyzing the alleged infirmities in the titles, it should be observed that there was no suggestion of infirmity in the title of McMillan and wife to the lands involved until they executed the deeds thereto to their minor sons. When those deeds were executed McMillan and wife retained whatever interest they did not convey to their grantees. Whatever they did not retain in themselves did pass to their grantees. And, assuming for the moment that the probate proceedings were valid and sufficient to authorize the execution of leases on the minors' behalf, the leases were executed by the parties who held both ends of the title. No outside party had or claimed an interest in the leased properties, so that the ordinary questions of law or of fact which raise doubts about the marketable character of a title could scarcely arise.

We think appellant is measurably right in his argument that the title to the 100 acres was no better than the title to the other leased properties. But what was the matter with the other titles? The rule is a just and familiar one that a marketable title is one which is free from reasonable doubt; and under this rule a title is doubtful and therefore unmarketable if it exposes the party holding it to the hazard of litigation. (*McNutt v. Nellans,* 82 Kan. 424, 108 Pac. 834; *Williams v. Bricker,* 83 Kan. 53, 109 Pac. 998, 30 L. R. A., n. s., 343; *Howe v. Coates,* 97 Minn. 385, 4 L. R. A., n. s., 1170.)

On the other hand, mere quibbles and pecadilloes which the ingenuity of counsel can raise against a title do not render it un-

marketable.  To what hazard of litigation did these titles expose their holder?  None is suggested, and it is difficult to imagine any. In Maupin on Marketable Title to Real Estate (p. 708), frequently quoted by this court (as in *Spaeth v. Kouns,* 95 Kan. 320, 326, 148 Pac. 651), it is said:

"The defect of title of which the purchaser complains must be of a substantial character; one from which he may suffer injury.  Mere immaterial defects which do not diminish in quantity, quality, or value the property contracted for, constitute no ground upon which he may reject the title. Facts must be known at the time which fairly raise a reasonable doubt as to the title; a mere possibility or conjecture that such a state of facts may be developed at some future time is not sufficient."

Tested by this rule, no defect of any consequence inhered in the titles to these leased properties.

It has been authoritatively settled by repeated decisions of this court that a clause in a deed which is at variance with the grant is a nullity; and under that rule the reservations in the deeds, aside from the life estate, were so clearly void as not to be a fair subject for debate among competent lawyers; and indeed there is no diversity of opinion among counsel in this case that the reservation in the first three deeds of "the right to mortgage, sell or otherwise dispose of said real estate by grantee is hereby forever reserved by said grantors," is utterly void. It was so held in *Durand v. Higgins,* 67 Kan. 110, 72 Pac. 567, and in *Brady v. Fuller,* 78 Kan. 448, 96 Pac. 854.  Similarly, it is not a debated question in this lawsuit that the provision, "in the event of the death of said grantee, title is to pass to the children of said grantee," is void under the rule of *Kirby v. Broaddus,* 94 Kan. 48, 145 Pac. 875, where it was held that notwithstanding a provision in a deed to a tract of land that in the event of the grantee's death the title conveyed was to pass to his heirs, the grantee took title in fee simple.  And in respect to the final proviso in the reservation that "if grantee leaves no living issue said title is to revert and vest in the heirs of said grantors," that proviso is a sheer nullity under the rule of *Connor v. Cole,* 112 Kan. 517, 211 Pac. 615; and nobody concerned in this lawsuit contends otherwise.

Touching the provision in the *fourth* deed, wherein the grantors reserved to themselves the right to mortgage, sell or otherwise dispose of the property until the grantee should attain the age of forty years, the trial court held the lease valid.  While it is sometimes

commendable and proper for solicitous parents in making gifts to their children to place reasonable restrictions upon alienation (as conceded in *Wright v. Jenks,* 124 Kan. 604, 608, 609, 261 Pac. 840), that cannot be done by such a provision as the second paragraph of the reservation which appears in the *fourth deed,* conveying the 100 acres to Duane McMillan. Since the deed conveyed the remainder in fee to the grantee, such reservation of a right in the grantors to mortgage the property was a nullity. In *Brady v. Fuller,* supra, where the deed conveyed the fee but reserved to the grantor the power "to mortgage, encumber, sell, lease, convey or otherwise dispose of the property," Mr. Justice Johnston, now chief justice, said:

"If, after conveying the property, the grantor undertook to keep a string upon the land and retain the power to mortgage, control and convey it, we would, as was said in *Durand v. Higgins,* 67 Kan. 110, 72 Pac. 567, 'be bound to disregard that clause and hold that it did not serve to defeat the conveyance of the fee.'" (p. 453.)

Passing next to the probate proceedings, it is not claimed that any mere procedural error was committed therein, but it is broadly contended that the probate court had no jurisdiction to authorize the guardian of the minors to lease their property for oil and gas exploration and development. The pertinent provisions of statute read:

"R. S. 20-1101. The probate courts . . . within their respective counties, shall have jurisdiction . . .

"*Fourth,* to appoint and remove guardians for minors, . . . and make all necessary orders relating to their estates, to direct and control their official acts, and to settle their accounts."

"R. S. 38-210. Guardians of the property of minors must prosecute and defend for their wards. They must, also, in other respects, manage their interests, under the direction of the court; they may thus lease their lands or loan their money during their minority, and may do all other acts which the court may deem for the benefit of the wards."

"R. S. 38-211. When a minor owns property in this state such property or any interest of the minor therein . . . may, under the direction of the probate court from which the letters of guardianship were issued under which the guardian is acting at the time the application is made, be sold or mortgaged on the verified petition of the guardian, either when such sale or mortgage is necessary for the minor's support or education or when his interest will be promoted by the sale thereof because of the unproductiveness of the property or its being exposed to waste or any other peculiar circumstances making it to the interest of the minor to have the property sold or mortgaged . . ."

In view of these statutory provisions it will be noted that the probate court had jurisdiction on proper showing to authorize an outright sale of the minors' lands. Can it be fairly contended that nothing less than authority to authorize an unqualified sale of the fee is implied in the statutory grant of jurisdiction. We think not. Part of the order of the probate court for the leasing of Meade Mc-Millan's lands for gas and oil mining (and the order relating to Duane's lands was to the same effect) reads:

"That the lease for oil and gas purposes of the interest of said minor in the real estate described in said petition will not be in contravention to the terms of any . . . conveyance upon which said minor's title to said lands are based.

"That the interest of said minor will be promoted by lease for oil and gas purposes of said real estate by reason of the unproductiveness of the property and because of its being exposed to waste.

"That the following peculiar circumstances make it to the interests of said minor to lease said property, to wit: That the adjoining lands are now under lease and that production from any of the adjoining lands would create a waste by drainage if the same be not leased so that development thereon can and will be had; that such development and exploration on said land will protect the same from waste by drainage; that production thereon, in case the same be had, will greatly increase the value of the land and the revenues therefrom for the benefit of said minor."

This court takes judicial cognizance of well-known facts respecting the oil and gas industry in this state (*Kemp v. Gas Co.*, 103 Kan. 595, 598, 175 Pac. 988), and it is perfectly obvious that when adjacent lands were being prospected and developed for the production of oil and gas the minors' lands would be subjected to waste by subsurface drainage of their valuable but fugacious minerals if appropriate steps were not speedily taken to bring about offset development. And thus the sale of such an interest in the minors' lands as would conserve their estates against waste was lawful and proper and commendable. And the sale of a right to explore and develop the property for oil and gas—in other words, the leasing of the property for oil and gas—was sanctioned by statute and by order of the probate court as a proper method of conserving the minors' estate against waste.

No case is cited by counsel holding that the lands of minors cannot be leased for oil and gas exploration and development. What the cases which we have examined do say is summarized in 2 Willis' Thornton on Oil and Gas, § 407, parts of which read:

"Gas and oil in land are a part of it, and an infant owning the land has no more power over them than he has over the fee simple of such land. They are minerals, a part of the land. . . . A lease of the land for gas or oil purposes must be made by the infant's guardian, as in an instance of a lease of an infant's land for coal mining. . . . Usually the court will authorize the execution of a lease, if it be shown that it would be for the benefit of the infant. . . . But a sale by the guardian, . . . without the approval of the court, where a statute requires an approval, is void, not voidable; and this is true of a guardian's lease of such land for all purposes. . . . If a guardian's lease has been approved by the court, the guardian cannot change it without the approval of the change by the court."

In *Wilson v. Youst*, 43 W. Va. 826, 39 L. R. A. 292, part of syllabus 3 reads:

"The petroleum oil underlying a tract of land which has been devised to a life tenant who is in possession, and which is to go to certain infant children after the decease of the life tenant, may be sold, upon the petition of the guardian of said infants, . . . or leased; . . ."

This court holds that there was no substantial infirmity nor reasonable doubt raised or suggested to support any finding of law or of fact that the lessors' titles were unmarketable; and so much of the trial court's judgment as held otherwise is erroneous and must be set aside.

Turning next to that portion of the judgment which awarded the lessors the statutory award of damages and attorneys' fees for the lessee's failure to discharge the leases of record when the time to begin development had elapsed and payment of rent was not forthcoming, little need be said. Even if there had been some tangible ground for holding the leases unmarketable that fact would not have justified the lessee in refusing to remove the cloud on lessors' title. He was bound to shoot or give up the gun. In this case the application of the statute seems peculiarly appropriate, because the lessor recorded the leases several months after they had expired by their terms for default of development and nonpayment of rent.

It is argued that the lessors were not entitled to $100 statutory damages for each separate lease. Why not? The suggested reason is that the five leases were contracted for in one general transaction. That argument is not good. To suit the wishes of the lessee, the lessors' lands were divided into five separate tracts—the three owned by the McMillans and their minor son Duane, and the two owned by the McMillans and their minor son Meade. Five separate instruments leasing these separate tracts of land were executed and

separately recorded. Each instrument evidenced a complete and independent contract. As was said in *Harter v. Edwards*, 108 Kan. 346, 349, 195 Pac. 607, and reiterated in *Caylor v. Oil Co.*, 110 Kan. 224, 226, 203 Pac. 735:

"The contract prescribed the terms which kept it alive, and fixed the conditions which terminated it."

A separate release of record was required to free each of the lessors' properties from the cloud resting on it through the recalcitrancy of the lessee.

Again, it is said that two independent actions were unnecessary to clear the record of the leases. The diversity of parties made it necessary that the proceedings to clear the records of the leases on Duane McMillan's lands should be kept separate from those dealing with the leases on Meade McMillan's lands, although, of course, the trial court, for its own convenience and with the consent or acquiescence of all parties concerned, could hear and decide the three cases together. This court holds that each failure of the lessee to discharge the record constituted a separate and distinct cause of action, and subjected him to a separate and distinct statutory penalty. (R. S. 55-201; *Cole v. Butler*, 103 Kan. 419, 422, 173 Pac. 978; *Doornbos v. Warwick*, 104 Kan. 102, 177 Pac. 527; *Mollohan v. Patton*, 110 Kan. 663, 665, 668, 202 Pac. 616; 205 Pac. 643.)

In view of the conclusions just reached certain other questions presented by the litigants are of no importance in this review. In the first of these consolidated cases, the judgment of the district court is sustained in so far as it relates to the marketable title of the lessors to the property and covered by the 100-acre lease, and it is reversed in so far as it pertains to the titles of the other four leased properties; and the trial court's judgment in the other two actions, awarding damages and attorneys' fees for the failure of the lessee to discharge the leases of record, is affirmed.