No. ·41,474

CARRIE MAY SPRINGER, *Appellee*, v. BESSIE E. LITSEY, ·ORPHA R. MILLER, C. H. CARRINGTON, EDITH G.· LITSEY, *Appellees;* MARIE GILLILAND, *Appellant.*

(345 P. 2d 669)

Opinion filed November 7, 1959.

*H. W. Goodwin,* of Wichita, argued the cause, and *Guy L. Goodwin,* of Wichita, was with him on the briefs for the appellant.

*Martin S. Hall,* of Harper, argued the cause, and *Max D. Hall,* of Anthony, was with him on the brief for the appellees.

The opinion of the court was delivered by

WERTZ, J.: This was an action for a declaratory judgment seeking construction of a written family settlement agreement and warranty deeds executed in accordance therewith, and for other equitable relief.

The pertinent facts are summarized and set out as follows: Columbus W. Litsey, a widower in his eighties, was the owner of 400 acres of land in Harper county, Kansas, which were under lease for oil and gas, and a residence in Wichita. He had three adult sons and two adult daughters, his sole heirs-at-law—Ethan L. Litsey, Ora F. Litsey, Floyd R. Litsey, Carrie May Springer and Orpha R. Carrington (now Miller). On July 7, 1934, his five children and their spouses gathered for a family reunion at the home of Carrie May Springer in Pecos, New Mexico, where their father was living. He informed them that he was old and feeble and desired to convey

to them all his real estate and that he wanted everything divided equally; that they should get together and make a division of his estate in parcels agreeable to themselves, providing for his care and maintenance during his lifetime.

In accordance with their father's request the sons and daughters withdrew to an available cabin to work out a tentative agreement. They divided the real estate into five tracts, valued them separately and determined the sums of money required to equalize them, making provision for the payment of notes owed by certain heirs. They then wrote the description of each tract on a separate slip of paper and each heir drew one of the five slips as his or her share. They were all aware of the fact that the father had recently executed an oil and gas lease on the 400-acre farm. They then returned to the Springer home and discussed the provisions of their tentative agreement with their father. At the conclusion of the discussion Orpha Miller (appellee) typed the family settlement in sextuplicate and it was thereupon signed by the father and his three sons and two daughters. It reads as follows:

"This being the wish of our father C. W. Litsey, through love and affection, we his five children in order to carry out his wishes and desires to enter into the following contract this 7th day of July 1934, Pecos, New Mexico, to wit;

"1.

"In case anyone of the heirs wishes to dispose of his or her share of said property, first choice to be offered to the heirs at the fixed valuation of all heirs. The valuations as follows: E. L. Litsey $3000, east 80, O. F. Litsey $3000 south 80, Carrie May Springer $3000 west 80, Orpha Carrington $1500, grass land 160 acres, Floyd R. Litsey $1500, Wichita Property. (As DEEDED)

"2.

"In case two or more wanted to purchase any of said property offered for sale at the fixed price, it would go to the highest bidder.

"3.

"All money's received from oil rights, leases or royalties of the said property to be divided equally among said heirs.

"4.

"In case of death of said heirs before death of father, property and money to go to husband or wife of deceased, or subject to a will of said heirs.

"5.

"In case of death of husband and wife that have no blood relation to wit: E. L. Litsey to be equally divided among his children. O. F. Litsey to be equally divided among his children. Carrie May Springer to her estate. Orpha R. Carrington to Homer Carrington. Floyd R. Litsey to Marie Gilliland.

"6.

"All money's and holdings to be divided equally among heirs after all expenses are paid.

"7.

"We the heirs of C. W. Litsey wish to authorize Carrie May Springer to have full right and power to check on all money's and handle all papers concerning same; in case of death or inability to handle same, one of the heirs to be selected.

"8.

"In case any one of said heirs wishes to trade or exchange for E. L. Litsey's 80 acres N½ NW¼ township 25-31-6 may do so without consent of heirs.

"9.

"To equalize the valuation E. L. Litsey, O. F. Litsey and Carrie May Springer each to pay into the estate the amount of $600; Carrie May Springer duly authorized to pay to Orpha R. Carrington and Floyd R. Litsey the amount of $(900 each ¾.

"10.

"Two notes of E. L. Litsey and Floyd R. Litsey in the amount of $600 each to be cancelled and the like sum to be paid to O. F. Litsey, Carrie May Springer and Orpha R. Carrington.

"11.

"This contract to be executed prior to the settlement of said estate."

[The above agreement was duly signed by the father and the five children.]

At the same time the sons and daughters executed and signed the following separate supplemental agreements:

"The grantor reserves for himself the sole use and benefit of the income from this property so long as he shall live."

"We, the undersigned; children of C. W. Litsey, hereby appoint Carrie Mae Springer to act as our agent for any funds coming into the estate of C. W. Litsey and authorize her to check against such funds now deposited or to be deposited in The First National Bank in Harper, Harper, Kansas."

Simultaneously with the execution of the written family settlement agreement, the father, C. W. Litsey, executed separate warranty deeds to the respective children, which deeds were subsequently duly recorded.

The record discloses that the Litsey family was closely knit. Carrie May Springer was the agent and secretary for the family and kept all of them advised of family affairs. Her first deposit in the Harper bank was $200 derived from oil and gas lease rental. She collected the income from the property and paid the bills, and the brothers and sisters went over the accounts once a year. Upon their father's death on February 15, 1939, funeral bills and expenses were paid from the account, assets were collected, notes were can-

celed, the owelty was paid and the balance was distributed equally among the five children. Carrie testified, "After father died some of the oil and gas money came in and I used it to make payments between the various heirs." She testified that her brother Ora spoke of paragraph three of the agreement, which referred to moneys received from oil rights or leases or royalties, to the effect that if there were any received it would be divided just the same as any other part.

On April 29, 1953, Carrie wrote a letter to Myrtle Ann Litsey, widow of her deceased brother Floyd R. Litsey and mother of Marie Gilliland (appellant), stating in part, "Now on Mar. 4th they started in on the oil well on the N. 80 and have worked day & night since. They want oil and don't know it may be a dry oil well but they have found gas. You know these oil men don't tell one very much. Yes we know that we (5) E. L. Ora O. C. & F.—all signed togather and if we would get an oil well you will get Floyd's share—and you know we can't tell what they will do—We didn't sell any royalty and if we do get oil you will have your share."

As late as March 9, 1957, Carrie wrote to Marie Gilliland, stating in part, "Gillie all the five heirs' recd a copy of the agreement that was made at Pecos N. Mex. 7/7-1934 Orpha and I here togather this 9th day of Mar. 1957, and we are thankful we have carried out the agreement of the said heirs up to this date. [¶] Now when any money is rec'd from any producing oil well on any of said properties, the money would be divided according to said agreement."

Carrie testified that she had placed the family settlement agreement in the bank and that when she wrote the letter to Myrtle she was trying to answer in a way that was according to the agreement. All the heirs were cognizant of Carrie's letters and the statements contained therein.

The trial court, in construing the instruments, found that the family settlement contract was intended by all the parties thereto to be effective only during the life of the father, C. W. Litsey, and a reasonable settlement period thereafter, and entered judgment accordingly for the appellees, Carrie May Springer, Bessie E. Litsey, Orpha R. Miller, C. H. Carrington and Edith G. Litsey. From this judgment Marie Gilliland appeals and, in substance, contends the trial court erred in not granting her a vested equitable undivided one-fifth interest in and to the oil and gas under the land in question.

Appellees first challenge appellant's right to be heard on the ground that notice of appeal was not served on all the adverse parties

whose rights are sought to be affected by the appeal. We have examined the record and find no merit to appellees' contention. No further comment is necessary.

Appellees concede the question to be determined on the issues joined is the interpretation of the agreement and the period of time it was intended to cover. We cannot bring ourselves to concur with the interpretation placed on the instruments by the trial court. We have before us the same written instruments as did the trial court and we can examine them and determine their meaning and effect as well as did the trial court. (*Gardner v. Spurlock,* 184 Kan. 765, 769, 339 P. 2d 65, and cases cited therein.)

The general rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistent with legal principles. Whatever may be the inaccuracy of expression or the inaptness of the words used in an instrument in a legal view, if the intention of the parties can be clearly discovered, the court will give effect to it and will liberally construe the words accordingly. It is not the function of the court to look outside the instrument to get at the intention of the parties; its sole duty is to find out what is meant by the language of the instrument (12 Am. Jur., Contracts, § 227). Greater latitude is allowed in construing an instrument which is prepared by a draftsman who is a layman, or unskilled, than in a case in which the instrument is prepared by a skillful draftsman (17 C. J. S. Contracts § 294, p. 687). The law presumes that the parties understood their contract and they had the intention which its terms import. It is not the function of courts to make contracts but to enforce them as made (*Gardner v. Spurlock,* supra).

It may be further stated that family settlements of estates are favorites of the law; when fairly made they are to be given a liberal interpretation and should not be disturbed by those who entered into them. (*Riffe v. Walton,* 105 Kan. 227, 182 Pac. 640, 6 A. L. R. 549; *Brent v. McDonald,* 180 Kan. 142, 152, 300 P. 2d 396.) Appellees agree with this statement of the law and concede the agreements are valid and the conveyance effective. The question then is —what did they convey?

The language of the instruments clearly reflects the father's desire to divide his entire estate equally among his five children and their named heirs, subject during his lifetime to his right to all the income therefrom. The father having only recently leased the land for oil and gas, they were all conscious of the prospective value of

those rights and that in the future it might be possible to drill a producing oil or gas well on part of the real estate and dry holes on other parts. In order for the children to share equally they made provision in paragraph three for such contingency by stating that each should participate equally in all money received from any oil and gas rights in the property conveyed. They made provision for plaintiff, Carrie Springer, as agent, to carry out the trust imposed in her and in case of her death, for one of the other heirs to serve in her place. The heirs further provided that during his lifetime their father would have all the income from the property. Paragraph six provided for an equal division of the personal property after the expenses were paid; paragraph nine, for the payment of owelty; paragraph ten, for the satisfaction of the debts owing the father by two of the children.

The desire to divide everything equally and equitably could not have been more fully demonstrated by laymen in drafting the instruments. The parties carried out the agreements and subsequent to the death of the father, Carrie, obviously in accordance with the family settlement agreement, collected some of the oil and gas money and made payment to the heirs. As late as April 29, 1953 and March 9, 1957, Carrie Springer, with the knowledge and consent of the remaining heirs, wrote Myrtle, the widow of Floyd, and Marie, the heir of Myrtle, respectively, to the effect that all the heirs had received a copy of the family settlement agreement and they were thankful they had carried out the agreement of the heirs up to that date; that when any money was received from any producing oil well on any of the property it would be divided according to the agreement. The clear intent of the parties as provided in the contract was expressed.

Pursuant to the contract, the father executed a warranty deed to each of his children, dividing the property as he had directed and as they had agreed upon among themselves. Each deed legally conveyed a fee simple title to the grantee therein as to the whole estate. However, in accordance with the contract entered into by the parties, the deeds were executed and the grantees thereof took legal title to the oil and gas in place subject to a trust in favor of the five children and their named successors and heirs, who, as tenants in common, held vested equitable title to the oil and gas in place. That this is the import of the contract is further borne out by the fact it provided that any one holder of the legal title could

sell his or her property upon consent of the other holders of the equitable title. (Restatement of the Law of Trusts, § 23, p. 72; 89 C. J. S. Trusts § 43, p. 778.) It is obvious that a bonafide purchaser for value of the legal title would take free and clear of any equitable rights vested in the *cestui que* trust.

In other words, at the completion of the entire transaction, the legal title to the real estate vested in each grantee of the deeds, and the equitable title to the oil and gas in place vested in the five children and their named successors and heirs. In view of the above, the rule against perpetuities has no application in this case.

The judgment of the trial court is reversed and the case is remanded with instructions to proceed with the trial in accordance with the views herein expressed.

It is so ordered.

FATZER, J., dissents.