No. 46,730

THE TRI-STATE HOTEL COMPANY, INC., ROGER B. FITCH, KENNETH C. FITCH, LOUISE B. FITCH, and the FOURTH NATIONAL BANK AND TRUST COMPANY, WICHITA, a National Banking Association, as Trustee, *Appellants*, v. SPHINX INVESTMENT CO., INC., *Appellee.*

(510 P. 2d 1223)

Opinion filed June 9, 1973.

*Gerrit H. Wormhoudt,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *Paul R. Kitch* and *Thomas D. Kitch,* of the same firm, were with him on the brief for the appellants.

*Robert Martin,* of Martin, Pringle, Schell & Fair, of Wichita, argued the cause, and *William L. Oliver, Jr.,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: This is an action to recover a deposit made under the terms of option purchase contracts entered into between the plaintiffs-appellants, other than the Fourth National Bank and Trust Company of Wichita, and the defendant-appellee. The Fourth National Bank and Trust Company received the funds in question from the escrow agent, who was permitted to withdraw from the litigation with the consent of all parties. The Tri-State Hotel Company, Inc.; Roger B. Fitch; Kenneth C. Fitch; Louise B. Fitch, and Carl A. Nelson, as trustee of the Rebecca Blackwood Rounds Trust; the Robert Sheldon Rounds Trust; and the Steven Cooper Rounds Trust own interests in property known as the Broadview Hotel in Wichita and certain adjacent tracts and are the vendors in the option purchase contracts in question. Carl A. Nelson, trustee, did not join other plaintiffs in the instigation of the action, but filed an entry of appearance waiving service of process against him as trustee and agreeing to be bound by any judgment of the district court and of this court in the event an appeal of the action.

For convenience we shall refer to plaintiffs-appellants collectively as Tri-State and to defendant-appellee as Sphinx.

The tracts of real estate involved in the option contracts, for purposes of identification, will be referred to as Tracts A, B, C and D. In negotiations leading up to the consummation of the option purchase contracts, plaintiffs-appellants were represented by Mr. R. C. McCormick, chairman of the board of directors of the Tri-State Hotel Company, Inc., which owned the Broadview Hotel. Negotiations for defendant-Sphinx were conducted primarily by Donald L. Herrick, treasurer and a member of the board of directors of Sphinx.

In December 1969 McCormick and Herrick reached an agreement in general terms for option purchase contracts of the properties involved. McCormick contacted John F. Eberhardt, a member of a Wichita law firm, and requested him to draw contracts on the basis of the general terms which had been agreed upon and which were summarized in a memo submitted to Eberhardt.

In his deposition, which is reproduced verbatim in the record, Eberhardt testified that he was requested to represent both parties in drafting the contracts; in processing all other paper work involved; in examination of titles; and was to act as escrow agent for

the option deposits totaling $100,000.00 for the four tracts involved. Eberhardt further testified that he discussed the matter of his joint representation of the parties with both Herrick and McCormick and pointed out potential disadvantages to the parties and certain objections on his part in representing both parties to the contracts. Eberhardt testified that he told Herrick and McCormick that there was no way he could draw a contract and be perfectly fair to both sides; that there were things involved in any contract that could be drawn one way or the other. He also expressed concern about title defects which might appear in the abstracts. He told the parties that he knew of his own knowledge there was a "flock" of abstracts and that if title defects were encountered there would be problems, arising with respect to serious defects which a party would stand on or defects that could be waived. Eberhardt also testified that despite his expressed reservations about dual representation both McCormick and Herrick requested that he represent both parties.

Eberhardt proceeded to draft the contracts, discussing the details thereof from time to time with McCormick until the drafts were finalized. There were three sparate contracts which were identical in terms except as to the different parties representing different ownerships in the various tracts and the diverse purchase prices for the particular property described. Each contract provided that it was contemporaneous with the other two contracts; that the obligations and terms of all three were interdependent; and that if any of the three contracts were canceled for nonmerchantability of title, the other two must also be canceled—that Sphinx must exercise its entitlement to cancel or its obligation to purchase, as the case might be, simultaneously with respect to all three contracts.

The portion of the contracts pertaining to delivery of abstracts disclosing marketable titles and providing for waiver of defects, which is relevant to this appeal, appears in Paragraph No. 3 of the contract which, in pertinent part, reads:

"3. As soon hereafter as is reasonably possible Tri-State shall deliver to attorney John F. Eberhardt of Foulston, Siefkin, Powers & Eberhardt, 600 Fourth National Bank Building, Wichita, Kansas, for purposes of title examination, abstracts of title to Tracts A, B and C certified to the approximate date of delivery by a bonded abstractor, which abstracts shall disclose good and marketable title in fee simple, free and clear of and from all liens and encumbrances except easements and restrictions of record, vested in Tri-State to all of Tract B, to an undivided one-half interest in Tract C, and to all of

Tract A except the portion thereof in which an undivided $\frac{7}{144}$ths fee interest is outstanding, and, with respect to said outstanding $\frac{7}{144}$ths fee interest, said abstract shall show marketable title vested in Tri-State to a 99-year lease thereon requiring monthly rental payments of $15.07 and expiring in the year 2019 A. D.

"Upon completion of the necessary title examination work said attorney's written title opinion shall be submitted to Tri-State and to Sphinx, and, in event said opinion reveals any merchantable defects in Tri-State's aforesaid title, Tri-State shall have a reasonable time thereafter within which to remedy all such defects at its own cost and expense. In event all such merchantable defects, if any, are not remedied by May 1, 1970, Sphinx shall have the right, at its discretion, to cancel this agreement, or, instead, to waive such defects and accept whatever title Tri-State is able to tender, which right shall be exercised by written notice to Tri-State on or before May 15, 1970, and failure to so notify Tri-State by that date shall constitute an irrevocable election by Sphinx to waive such defects and accept Tri-State's actual title. In event this agreement is cancelled because of nonmerchantability of title to Tracts A, B, C, or D (as provided in following paragraph '4' hereof), Sphinx' initial $80,750.00 option payment hereunder shall forthwith be refunded to Sphinx, and the parties hereto shall be under no further obligation to each other hereunder. But if title to all of said tracts is merchantable or is rendered merchantable by May 1, 1970, or if on or before May 15, 1970, Sphinx waives all merchantable defects in the title to said tracts and no cancellation of this option contract is effected under paragraph '4' hereof, then and in such event Tri-State shall forthwith be entiled to unrestricted ownership of said $80,750.00 initial option payment  . . ."

After the final drafts were completed the contracts were executed by McCormick and Herrick on December 23, 1969. On that day Eberhardt was in McCormick's office and after the signing of the contracts; McCormick, according to Eberhardt's testimony, "had a girl give me what he thought were all the rest of the abstracts." Mr. Eberhardt and two other members of his firm, whom he identified as Dick Harris and Phil Frick, commenced the examination of the abstracts.

It was soon discovered that a part of Tract A, upon which the Broadview is located, was not covered by any of the abstracts— as Eberhardt described the situation "we had abstracts that kept going to this place on all sides and we couldn't find anything that covered that particular tract." Efforts were made through the abstract company to locate the missing portion. Eberhardt had several more conversations with McCormick who was positive that he had complete abstracts of title. He told Eberhardt that he (McCormick) thought at one time they had already had a quiet title suit involving the same thing. Eberhardt testified that it

took a month or two to locate all the abstracts on the property and finally it was necessary to have an abstract made. Ultimately, on April 16, 1970, a title opinion was rendered. The opinion was drafted in letter form by Mr. Eberhardt, addressed to Herrick and a copy sent to McCormick. The opinion revealed four merchantable title defects, three of which were said to be of no significance and could easily be cured before May 1, 1970, the cutoff date under the terms of the contract.

The fourth merchantable title defect which gives rise to this controversy was described by Eberhardt in this fashion:

"Although it is of no practical significance, the fourth merchantable title defect raises problems which cannot be remedied by May 1. As is explained in comment '(2)' of our title opinion covering Tract A, on June 30, 1925, The Arkansas Valley Improvement Company conveyed to The Siedhoff Hotel Company part of Holmes Addition (which is bounded by the Arkansas River on the west, by the south line of the NE/4 of Section 20-27S-1E on the north, by Waco Avenue on the east, and by Douglas Avenue on the south). However, in this deed the grantor excepted and retained a small wedge of land described by metes and bounds as set out in comment '(2)'. When the Siedhoff Hotel Company reconveyed this part of Holmes Addition to The Tri-State Hotel Company, Inc. on July 31, 1964, the deed again excepted this same wedge of ground that is 10'5" wide (north and south) at its east end, 2'1" wide at its west end, 30' long on its southern side, and 25' long on its northern side. From that time to this there has been no deed of any sort covering this diagonal strip of land, title to which is still vested in The Arkansas Valley Improvement Company, a Kansas corporation which is no longer in existence. So you can visualize this strip more readily I enclose a Xerox copy of a plat of Holmes Addition on which our troublesome wedge of land appears as a diagonal red mark immediately north of Lots 5 and 6. This strip is underneath the hotel improvements on Tract A. Beyond all shadow of doubt Tri-State has long since acquired indefeasible title to this strip by adverse possession, continued occupancy, and payment of real property taxes thereon. Nevertheless, since we can no longer obtain a quitclaim deed from the record title owner, our only remedy is to file quiet title proceedings. This, too, presents no problem whatever, except that it will require a minimum of 60 days to file suit, obtain service by publication, and secure judgment quieting Tri-State's title against The Arkansas Valley Improvement Company and its unknown successors, trustees, and assigns. By the same token, it is impossible to rectify this title defect by May 1, or even by May 15.

"Inasmuch as this defect cannot be removed by May 1, under paragraph '3' of the Sphinx-Tri-State base contract Sphinx has until May 15 to decide whether to cancel or retain its option. I would hope, though, that you can give me Sphinx' decision much sooner than May 15. Certainly I must know very quickly whether or not it will be necessary for Tri-State to prepay the last half of 1969 real property taxes and to prepay the two escrow contracts prior to May 1. Nor do I want to file quiet title proceedings

until I know whether or not Sphinx will waive this one title defect, conditioned upon our promptly instituting and prosecuting quiet title action to final judgment at the sole cost of Tri-State. In this connection, having to represent both the seller and buyer puts me in an unhappy predicament. I must say, however, that I would strongly recommend that you waive this defect and accept Tri-State's title, conditioned upon Tri-State's authorizing us to conduct quiet title proceedings, even if I were representing Sphinx alone because the defect, although technically a 'merchantable' one, is of no real consequence whatever and can easily be removed by a routine title suit."

The board of directors of Sphinx met on May 7, 1970, and considered the action which should be taken on Eberhardt's letter relating to the title defects. The action of Sphinx is reflected in the minutes of the board meeting and the deposition testimony of Herrick and Albert A. Kaine, Jr., vice-president and director. The discussion at the meeting centered around the problems Sphinx might encounter if it waived the defects in terms of being able to retain the financing commitment which Sphinx had previously arranged on the property. One of the directors, Glenn Jones, an attorney, warned of difficulties that might be encountered in various situations that were under negotiations by reason of not having merchantable title to the property.

Mr. Herrick testified that he had communicated with the correspondent for a mortgage lender on the property and was told that there would be a risk of having the mortgage lender back out completely or raise the interest rate, or require more personal signatures on the loan, or otherwise change existing commitments. The discussion culminated in a resolution adopted by the board of directors as follows:

"BE IT RESOLVED, that WHEREAS the Tri-State Hotel Company, Inc. through its attorney, John F. Eberhardt, had indicated it cannot deliver merchantable title by May 1, 1970, and WHEREAS under the Sphinx-Tri-State base contract, Sphinx Investment Co., Inc. has the option of waiving the defect or cancelling the contract, Sphinx hereby elects not to waive the defect and authorizes its President to send notices of this fact by certified mail to all interested parties and to demand the return of its $100,000 option money plus interest from the escrow agent, John F. Eberhardt."

Thereafter, Sphinx sent notice of their election to terminate the contracts to the respective parties and made formal demand for the return of the option money paid in escrow to Eberhardt.

In the meantime, Eberhardt informed McCormick that he was going to hold the option deposit a few days and unless McCormick commenced litigation he was going to return the money to Sphinx. Thereafter this litigation was promptly instigated.

In their petition plaintiffs alleged that on or before May 1, 1970, they became unconditionally entitled to receive the option payments and that all conditions precedent to their rights to receive such payments had been performed or had occurred. Basically, plaintiffs contended that Sphinx had forfeited the deposit and that plaintiffs should be entitled to keep their property and have the option money as well.

Defendant answered setting out the title defect referred to and alleging that it had given written notice by certified mail that it was cancelling its option contract with each of the plaintiffs inasmuch as Tri-State Hotel Company, Inc. did not have merchantable title to the property and that merchantable title could not be delivered on or before May 15, 1970.

The case came on for trial to the court. The evidence consisted of various exhibits, depositions and the testimony of several parties. The trial court held in favor of Sphinx and entered findings of fact and conclusions of law. It appears the trial court's conclusions were essentially based upon two premises. First, there was a merchantable defect giving Sphinx the discretionary right to cancel the contracts and, second, even if the title was merchantable Eberhardt's conclusion that Sphinx had the right to cancel was binding since he was acting as attorney and agent for plaintiffs. Specifically, the trial court concluded that the outstanding title in Arkansas Valley Improvement Company to the irregularly shaped strip of land lying beneath the hotel building constituted a marketable title defect and, even though Tri-State may have acquired title by adverse possession the title was not rendered marketable since a quiet title action would be required, thus Sphinx as purchaser would be exposed to the hazards of litigation. Specific findings and conclusions of the trial court will be considered and discussed in the course of this opinion.

The basic question on appeal is whether the outstanding fee title to an irregularly shaped strip of land approximately 6'6" × 30' × 2' × 25', which now lies beneath an addition to the Broadview Hotel constructed in 1952, amounts to a merchantable defect which could not be cured within the time limit specified in the contract.

We deem it unnecessary for the purposes of our decision to trace in detail the devolution of title to the property in question. It will suffice to say that the tract causing the problem was de-

scribed and expressly excepted from the property described in a warranty deed, dated June 30, 1925, from the Arkansas Valley Improvement Company to Seidhoff Hotel Company, Tri-State's predecessor in title. Arkansas Valley Improvement Company and its companion corporation, Arkansas Valley Interurban Railway Company, commenced assembling the properties in 1919 and 1920 for the purpose of developing a site for a hotel and railway depot. There were a number of lease assignments and exchanges of property between these two entities prior to the conveyance to Seidhoff. In 1935 there were several agreements simultaneously executed between the Arkansas Valley Improvement Company, the Arkansas Valley Interurban Railway Company and Seidhoff which dealt with easements for railroad purposes, none of which affected the fee title to the tract in question. Later, Seidhoff deeded all of the property owned by it to Tri-State and again the identical exception was expressly set out in the description of the property conveyed. Tri-State claims the easement conveyances between Arkansas Valley Improvement Company, Arkansas Valley Interurban Railway Company and Seidhoff should serve as a basis for an inference that it was intended that Seidhoff acquired the property in fee. It appears to be undisputed that fee title to the problem tract remains in the Arkansas Valley Improvement Company. Arkansas Valley Improvement Company was dissolved in 1943.

On appeal Tri-State attacks the trial court's judgment on a number of grounds. Its first contention gets to the meat of the issue in the case, whether the title defect, upon which Sphinx relied as a basis for cancellation of the contracts, amounted to a merchantable defect.

The contracts in this case are clear, specific and unambiguous. The language is neither doubtful nor obscure. They obligated the vendors to furnish abstracts disclosing good and merchantable title in fee simple. The terms "merchantable title" and "marketable title" are interchangeable when used in the context of a land contract, and they denote the same quality of title to be furnished. (*Darby v. Keeran*, 211 Kan. 133, 505 P. 2d 710.)

Where a contract for the sale and purchase of land provides that the vendor shall furnish vendee or his representative an abstract disclosing a good and marketable title in fee simple, such as the contract here, the abstract must show on its face a market-

able title in the vendor. (*Darby v. Keeran,* supra; *Hamilton v. Binger,* 162 Kan. 415, 176 P. 2d 553; 55 Am. Jur., Vendor and Purchaser, § 297, p. 734.) A good or merchantable title within the meaning of a contract of sale, in the absence of provisions to the contrary, generally means a record title. (92 C. J. S., Vendor & Purchaser, § 192, p. 32.)

There can be no doubt regarding what constitutes a marketable or merchantable title in this jurisdiction. This court has been confronted with the question on many occasions, most recently in the case of *Darby v. Keeran,* supra, where we held:

"A marketable title is one which is free from reasonable doubt and will not expose the party who holds it to the hazards of litigation." (Syl. ¶ 6.)

Many of the cases in which the rule has been stated and approved are referred to in the *Darby* opinion and citations thereof will not be repeated at this early date. Guidelines for the application of the rule with respect to specific title defects have been set out in many of our decisions. For example in *Johnson Bros. Furniture Co. v. Rothfuss,* 186 Kan. 287, 349 P. 2d 903, we held:

"To render the title to real estate unmarketable, the defect of which the purchaser complains must be of a substantial character and one from which he may suffer injury. Mere immaterial defects which do not diminish in quantity, quality or value the property contracted for, constitute no ground upon which the purchaser may reject the title. Facts must be known at the time which fairly raise a reasonable doubt as to the title; a mere possibility or conjecture that such a state of facts may be developed at some future time is not sufficient." (Syl. ¶ 2.)

See, also, *Peatling v. Baird,* 168 Kan. 528, 213 P. 2d 1015; *Burton v. Mellor,* 159 Kan. 262, 154 P. 2d 108; and *Newell v. McMillan,* 139 Kan. 94, 30 P. 2d 126.

In the instant case, it is undisputed that Tri-State does not have title to the small irregular tract in question, the title to which remains in Arkansas Valley Improvement Company. In other words, title to the problem tract is outstanding. Tri-State says the defect could be cured or is extinguished by adverse possession; that it is not a defect of substantial character which might cause injury to the buyer; and thus can not serve as a ground for cancellation by Sphinx. We cannot agree. In all probability, as Tri-State says, adverse possession could be established showing that the outstanding title in this case is barred. But the question is not whether adverse possession is or could be established by affidavits or a quiet title suit, it is whether, when delivered to Eberhardt, the abstracts disclosed a merchantable title which Sphinx must accept.

The issue was settled in *Beeler v. Sims,* 91 Kan. 757, 139 Pac. 371, reaffirmed on rehearing in *Beeler v. Sims,* 93 Kan. 213, 144 Pac. 237. The case was decided upon the principle:

". . . [T]hat a contract to furnish an abstract showing a marketable title is not complied with by presenting one that purports to show by affidavit only that the fee title, which appears by the abstract to be outstanding, has been divested by limitations or adverse possession. . . ." (p. 217.)

Further in the opinion it was stated:

". . . The burden should be upon the vendor to procure a conveyance from the persons holding such an interest or otherwise to establish a superior right in himself. We are not required to pass upon the validity of the plaintiff's title, but only upon the sufficiency of the abstract to compel specific performance. . . ." (pp. 220, 221.)

*McNutt v. Nellans,* 82 Kan. 424, 108 Pac. 834, was an action to recover a sum paid by vendees on a land purchase contract on the ground vendor had failed to furnish an abstract showing a clear title. Prior to judgment, the vendor filed and secured a judgment in a quiet title action which he asserted as a defense to the vendees' action to recover their partial payment. On appeal this court affirmed the trial court's judgment for the vendees. The *McNutt* case clearly stands for the proposition that a title must be marketable at the time of performance of the contract without regard to the fact that it may later be cleared by a quiet title suit.

In *Eisenhour v. Cities Service Oil Co.,* 149 Kan. 853, 89 P. 2d 912, it was held:

"A title need not be bad in fact in order to be nonmerchantable or unmarketable. It is sufficient to render it so if an ordinarily prudent man with knowledge of the facts and aware of the legal questions involved would not accept it in the ordinary course of business." (Syl. ¶ 3.)

See, also, *Darby v. Keeran,* supra; and *Williams v. Bricker,* 83 Kan. 53, 109 Pac. 998.

The rule that where a contract calls for the delivery of abstracts disclosing merchantable title, a purchaser will not be compelled to accept a title based on adverse possession is in accord with decisions on the point in most other jurisdictions. In 46 A. L. R. 2d, Anno., Marketable Title—Adverse Possession, p. 545, the author observes:

"It is generally held that where a contract for the sale of land provides that the purchaser shall be supplied with an abstract showing that the vendor had title to the land to be conveyed, the purchaser will not be required to accept anything less than a good record title, and consequently conveyance of a title good only by adverse possession or under the statute of limitations will not satisfy the contract." (p. 561.)

This appropriate statement appears in 92 C. J. S., Vendor & Purchaser, § 193, p. 34:

"Where the contract either expressly or impliedly calls for a record title, a title by adverse possession, prescription, or limitations is not sufficient, even though it may in fact constitute a good or marketable title. . . ."

See, also, 55 Am. Jur., Vendor and Purchaser, § 204, pp. 666, 667.

Tri-State relies heavily upon the case of *Burton v. Mellor,* supra, in support of its argument that the defect here does not rise to the level of a merchantable defect. In that case, Burton, the vendor, brought the action to recover the agreed consideration for the sale of an oil and gas lease from the vendee, Mellor. Mellor defended on the alleged failure of Burton to furnish an abstract showing a merchantable title to the property. Mellor's objection to the title rested on a lease to a mining corporation executed by the then owner of the land about fifty-eight years prior to the sale in question. The previous lessee was a corporation which had forfeited its charter twenty-five years after the execution of the lease; had never complied with the terms of the lease or paid any rent thereunder; and had never attempted to assign or transfer any interest under the lease at any time. As in the instant case, there was no corporate entity available to receive a notice or to execute a quitclaim deed or release, but there the similarity between the two cases ends. In *Burton* the facts concerning the defunct corporation and its noncompliance with the terms of the lease were compiled in an affidavit of the secretary of the corporation and presented to Mellor and his counsel prior to the time Mellor refused to accept the title. In his affidavit the secretary averred that he was the sole surviving officer of the corporation; that at no time was there any prospecting for any mining products by the corporation on the lands covered by the lease; and that no payments provided for in the lease were ever made by the corporation. A lease which was subject to forfeiture and the terms of which had never been complied with cannot be equated with an outstanding fee such as in the case at bar. We view the *Burton* case as unpersuasive on the issue before us here.

In this action it was not the function of the trial court, nor of this court on appeal, to determine whether or not the title is or is not bad, but whether it is doubtful enough to cause it to be unmerchantable. (*Darby v. Keeran,* supra; *Eisenhour v. Cities Service Oil Co.,* supra; *Williams v. Bricker,* supra; and *McNutt v. Nellans,* supra.)

Tri-State suggests the applicability of the principle that any conveyance of real estate passes all of the estate of the grantor therein unless the intent to pass a less estate should expressly appear or be necessarily implied in the terms of the grant (citing *Epperson v. Bennett*, 161 Kan. 298, 167 P. 2d 606, 166 A. L. R. 816.) The rule is sound and applicable when necessary in construing the effect of a written instrument, such as in *Epperson* and the later case of *Shepard, Executrix v. John Hancock Mutual Life Ins. Co.*, 189 Kan. 125, 368 P. 2d 19, but it has no application where a deed contains an express, explicit and unequivocal exception such as in the instant case.

Likewise, other cases cited by Tri-State such as *Abercrombie v. Simmons*, 71 Kan. 538, 81 Pac. 208; and *Barker v. Lashbrook*, 128 Kan. 595, 279 Pac. 12, dealing with railroad right-of-ways are not relevant to the issue here.

Tri-State contends that Eberhardt should have considered evidence discovered by it after the suit was filed. By the express terms of the contract, Tri-State was to deliver abstracts of title to Eberhardt; it was not incumbent upon him or Sphinx to furnish evidence of the title. However, according to Eberhardt's testimony, which is undisputed, he and other members of his firm searched diligently for abstracts and quiet title actions which McCormick insisted were in existence. It would fly in the face of the clear meaning of the contract to require Sphinx to base its decision whether to accept title, which it was required to do prior to May 15, on documents and title evidence not within the knowledge of either Tri-State or the examining attorneys at the time.

Despite the specific provisions pertaining to the dates, May 1 and May 15, Tri-State argues the contract should be construed so as to provide a reasonable time thereafter to cure defects. In his testimony Eberhardt explained that since the closing date of the option contract was July 1, 1970, dates in advance thereof had to be established for the clearing of title and the fixing of the time in which Sphinx had to cancel the contract or waive any defects which might appear. The significance of the dates May 1 and May 15 is emphasized in the language of Paragraph No. 3, first to provide that if defects are not remedied by May 1, then Sphinx has the right, at its discretion, to cancel by written notice before May 15, and failure therein would constitute an irrevocable

election by Sphinx to waive any defects. The import of the dates was then restated in the alternative that "if title to all of said tracts is merchantable or is rendered merchantable by May 1, 1970, or if on or before May 15, 1970, Sphinx waives all merchantable defects in the title" then Tri-State would be entitled to unrestricted ownership of the initial option payment. The language used is explicit and the import and materiality of the dates, May 1 and May 15, are made clear. The provisions of the contract, in this regard, must be given the effect stated in the clear language employed. The law presumes that the parties understood their contract and that they had the intention which its terms import. (*Schnug v. Schnug,* 203 Kan. 380, 454 P. 2d 474.) It is not the function of courts to make contracts, but to enforce them as made (*Springer v. Litsey,* 185 Kan. 531, 345 P. 2d 669), nor is it within the province of the court to reform an instrument by rejecting words of clear and definite meaning and substituting others therefor. (*Drilling, Inc. v. Warren,* 185 Kan. 29, 340 P. 2d 919; and *Geier v. Eagle-Cherokee Coal Mining Co.,* 181 Kan. 567, 313 P. 2d 731.)

Tri-State further contends that Sphinx in continuing its efforts to market the property after receipt of Eberhardt's title opinion waived any defect mentioned therein and is estopped from claiming to the contrary. On this point the trial court found:

"The mere fact that defendant Sphinx continued in its efforts to sell the property described in the contracts before they cancelled the contracts is not in and of itself sufficient to estop them from cancelling the contracts in accord with their terms and within the time set out in the contracts in Paragraph 3 since within the time set out in Paragraph 3 of the contracts, the defendant Sphinx exercised its option to cancel because of non-marketability."

The trial court's conclusions with respect to this contention appear in conclusions Nos. 6 and 7 which read:

"6. While it was stipulated that the defendant Sphinx followed through with its previous contracts that had been made in an effort to sell the property after it was notified of the title defect, such conduct is not inconsistent with its cancellation of the contracts. There is no evidence that the plaintiffs changed their position or acted to their detriment because the defendant Sphinx continued its efforts to sell the property until May 7, 1970, the date of the board of directors' meeting of the Sphinx Corporation and since the contracts provided that the defendant Sphinx had until May 15, 1970, to decide whether to cancel the contracts or waive the defect, the defendant Sphinx had the right to continue to explore the possibilities of a resale.

"7. The defendant Sphinx gave timely notice pursuant to Paragraph 3 of the contracts of its decision to cancel the contracts, and it discontinued its efforts to sell the property after such notification."

Viewing the evidence presented within the context of the express terms of the contract, we believe the trial court correctly disposed of Tri-State's claim of estoppel.

When the title opinion was received, Herrick and Kaine did not know what the ultimate decision of the Sphinx board of directors might be. The evidence is that they continued to follow up and respond to contacts previously made. No new contacts were made and all activity ceased after the May 7th meeting of the Sphinx directors, which was the first meeting after receipt of the title opinion. There is no evidence that Tri-State was misled or that it changed its position in any way because of the continued activities of Herrick and Kaine. A party is not estopped by an act of his which does not mislead his adversary so as to cause him to act to his prejudice. (*Bergsten v. Erickson,* 154 Kan. 349, 118 P. 2d 610; and *In re Town of Olsburg,* 118 Kan. 440, 235 Pac. 845.)

Tri-State cites our recent case of *Thompson v. Anderson,* 209 Kan. 547, 498 P. 2d 1, wherein the doctrine of equitable estoppel was applied with respect to an alleged violation of a first option agreement among corporate stockholders. The plaintiff Thompson made no attempt to invoke the first option agreement with respect to the purchase of defendants' stock by an outsider, but permitted the transfer thereof by defendants without objection. The evidence clearly showed a change of position by defendants and reliance by them on the acquiescence of plaintiff, a situation clearly distinguishable from that existing here.

Finally, Tri-State argues the trial court erred in determining that Eberhardt's title opinion and notification to Sphinx of its right to cancel was binding on Tri-State since Eberhardt represented both parties and as such was the agent of Tri-State as well as Sphinx. On this point we are inclined to agree with the position taken by Tri-State. While it is true Eberhardt represented both parties, his duties and responsibilities were clearly defined in the contract, but they did not include that of arbiter. It is proper for the court, in determining marketability of a title, to take into consideration the fact a competent attorney has rendered an opinion the title is not marketable. But whether a title is in fact marketable presents a question of law for the court. (*Peatling v. Baird,* supra.)

We rest our decision on the hypotheses that Tri-State failed to furnish abstracts disclosing a marketable title; that the defect was not remedied by May 1; and that Sphinx exercised its discretionary right to cancel prior to May 15, all as provided for in the explicit terms of the contract.

The judgment is affirmed.