No. 46,706

Mobile Acres, Inc., *Appellant*, v. Fred and Virginia Kurata, *Appellees.*

(508 P. 2d 889)

Opinion filed April 7, 1973.

*Edward G. Collister, Jr.,* of the firm of Collister, Burr & Kampschroeder, of Lawrence, argued the cause and was on the brief for the appellant.

*Leonard O. Thomas,* of the firm of Weeks, Thomas, Lysaught, Bingham & Johnston Chartered, argued the cause, and *John O. Somers,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

FONTRON, J.: The plaintiff, Mobile Acres, Inc., brings this action pursuant to K. S. A. 60-1701, *et seq.,* seeking a declaratory judgment construing the provisions of a lease agreement. The controversy is over who is responsible for the payment of the ad valorem taxes during the lease period, the plaintiff lessee, or the defendant lessors. The trial court entered judgment in favor of the defendants and the plaintiff has appealed. We shall frequently refer to the plaintiff as lessee, or Mobile Acres, and to the defendants as lessors, or the Kuratas.

Sometime in 1967, Messrs. Alan Hill and Bill Webster, who are residents of Lawrence, entered into negotiations with Fred Kurata, also of Lawrence, for the lease of a ten-acre tract near the turnpike exit west of that city, as a site for a mobile home park. The negotiations culminated on August 11, 1967, in the execution of a lease for a period of ten years, with two ten-year renewal options. The stipulated rental was 7 per cent of the gross sales, as sales were defined by the lease. All parties understood that the tract would be improved for use as a mobile home court by the laying out and paving of streets, the installation of utilities, the planting of trees and shrubbery, and the construction of home sites consisting of gravel pads for the installation of the mobile

homes with abutting concrete patios. A site plan marked Exhibit A was attached to the lease, depicting the work to be done.

As permitted by the terms of the lease, Messrs. Hill and Webster subsequently assigned the lease to Mobile Acres, Inc., a corporation formed and owned by them. Mobile now stands in the shoes formerly worn by Hill and Webster and will be designated herein as lessee.

Construction work was started by the lessee within the time required by the lease and was completed, so far as we can tell from the record, in 1968. It is our understanding that the park is presently in full operation, with all of the home sites happily occupied.

Trouble developed in the spring of 1969 when Mr. Kurata received a notice from the county assessor showing an assessed valuation of $6000 on the land and $7600 on the improvements. He then consulted with the attorney who had prepared the lease, who proceeded to confer with the local taxing authorities, with the end result that the taxes on the land itself without improvements were assessed to the Kuratas and the taxes on the improvements were assessed to Mobile Acres. This action sparked the present lawsuit.

It will not be necessary to quote the lease in full, which is just as well in view of its length. Paragraph 12 contains the roots of this lawsuit. It reads as follows:

"*All ad valorem real estate taxes assessed against said real estate as improved pursuant to said Exhibit A, and all special assessments which may in the future become levied against said real estate, shall be paid by lessors except as herein specified.* Without the prior written consent of lessors, the lessees shall not permit any other property to become affixed or attached to said real estate in such manner that the same shall subject such real estate to additional ad valorem taxes, and if they so do the lessees shall pay such additional ad valorem taxes; nor shall the lessees in any way initiate any request to any governing body for improvements which would result in special assessments against said real estate. Lessors hereby agree that lessees may request of the City of Lawrence a sanitary sewer from a point 390 feet south of the northeast corner of the above described real estate, the special assessment therefor to be paid as follows: Lessees shall pay the amount of such assessment, the lessors to reimburse lessees to the extent of $2,040.00 thereof, over a period of ten years, one-tenth each year (not to exceed $204.00 in any one year) to be deducted from rents payable to lessors hereunder. In the event the ad valorem taxes for the year 1970 and subsequent years of this lease exceed the amount of ad valorem taxes payable by lessors for the year 1969, the lessees shall pay to the lessors the difference between the

amount of such subsequent annual ad valorem taxes less the amount of such taxes for the year 1969. Provided, that if during any calendar year beginning with the year 1970, the rentals paid by lessees to lessors exceed the amount of rentals so paid for the calendar year 1969, the amount for increased ad valorem taxes to be paid by lessees to lessors, shall be reduced by the amount of increased rentals so paid for any such calendar year over the amount of rentals paid by lessees to lessors for the calendar year 1969. In the event lessors fail to pay any of the taxes on said real estate, lessees may pay the same and receive a credit for any taxes so paid on the rent due hereunder." (Emphasis supplied.)

The dispute is centered upon the sense or meaning of the first sentence of the paragraph (shown in italics) so far as responsibility for payment of ad valorem taxes is concerned. Mobile Acres, on the one hand, would have the language construed as requiring the lessors, the Kuratas, to pay the ad valorem taxes on both land and the improvements shown on Exhibit A, while the Kuratas, on their part, would have us interpret the provision as requiring Mobile Acres to bear the burden of the taxes on the improvements, while they, the lessors, would be obligated to pay the tax on the land, alone.

The trial court adopted the view advanced by the lessors. The court found that the lease was not ambiguous; that the improvements did not become a part of the real estate for ad valorem tax purposes but were the personal property of the lessee for tax purposes; and that under the contract the lessee, as a matter of law, was liable for payment of the taxes assessed against the improvements so long as the lease was in effect. On this basis the court entered summary judgment in favor of the defendant lessors.

Three points are raised on the lessee's appeal: (1) The lease requires as a matter of law that *lessors* pay the taxes on improvements made by the lessee according to the site plan attached to the lease as Exhibit A. (2) At the very least, the *lessors* should pay the ad valorem taxes after the first 20 years, provided both ten-year options are exercised. (The lease provides the improvements become the property of lessors at the conclusion of the second ten-year option.) (3) The court erroneously determined there were no genuine issues of fact requiring the presentation of evidence as to the parties' intentions. This ground is urged in the event this court finds the lease to be ambiguous as to the payment of taxes.

On appeal, both sides vigorously assert that the contract is not

ambiguous. However, they disagree violently as to what is meant by or included within the term "ad valorem real estate taxes assessed against said real estate as improved pursuant to said Exhibit A." This difference of opinion might tend to indicate that each side considers the lease agreement as being unambiguous only in its own favor.

Each side of this controversy supports its position by reference to certain provisions and certain language contained in the lease. The lessee points out that when the lease was signed it was contemplated by both the lessors and the lessees that the premises were to be used for a mobile home park and they all knew the land was to be improved to this end exactly as shown in the site plan attached to the lease as an exhibit. The lessee argues that when the parties used the phrase "All ad valorem real estate taxes assessed against said real estate as improved pursuant to Exhibit A" they were speaking of the real estate as more than bare raw land; they were speaking of the land as real estate improved according to the site plan.

Mobile Acres further calls attention to that part of paragraph 12 following the first sentence (which we have heretofore italicized). Specifically it is argued that the remaining provisions of the paragraph strongly imply that lessors were to pay all ad valorem taxes on the land and the *original* improvements placed thereon according to the site plan, while the lessees were to pay whatever additional taxes might result from *subsequent* improvements erected on the land.

Other provisions in the lease are cited by Mobile Acres as indicating, in its opinion, that the lessors were to pay the ad valorem taxes on the original improvements placed on the land pursuant to Exhibit A. However, we deem it unnecessary to proceed any further into lessee's argument at this time in view of our ultimate disposition of this case.

With equal sincerity the lessors contend that taxes on the improvements are personal taxes, not real estate taxes; that the phrase "assessed against said real estate as improved pursuant to said Exhibit A" means, and is limited to, the change in the use and the increase in value of the land itself; that the value of the land, divorced from the value of the improvements, has been increased by its conversion from farm land to a park for mobile homes; and that this was what the parties had in mind.

In addition, the lessors call attention to K. S. A. 79-328 providing that improvements on leased lands which do not become part of the realty shall be assessed to the owner of the improvements as personal property, and they say the test of whether or not improvements become part of the real estate is the ownership of the improvements and the intent of the parties concerning the same. They rely heavily on lease provisions which permit the lessees to remove the improvements either at the end of the primary term of the lease or at the end of the first ten-year option, after first offering the same to the lessors at a price to be determined in the manner set out in the lease. *Boxer v. Sears,* 119 Kan. 733, 241 Pac. 443, is cited by the lessors for the legal proposition that where a lessee is privileged to remove the improvements, they do not become a part of the realty, but are assessable to the owner as personal property.

Other arguments are advanced by able counsel on both sides as they seek to develop their positions that the provisions of the lease are clear and unambiguous in favor of their respective clients. However, further elaboration on their theses would not prove fruitful in our opinion. We have arrived at the conclusion that it cannot be said as a matter of law from the lease itself which of the contracting parties is required to bear the burden of ad valorem taxes. In other words we view the lease as being ambiguous in such respect.

We have previously had occasion to define ambiguity. In *Wood v. Hatcher,* 199 Kan. 238, 428 P. 2d 799, the court said:

". . . The language in a contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in a sense the contract may be understood to reach two or more possible meanings. . . ." (p. 242.)

This language is quoted with approval in *Mays v. Middle Iowa Realty Corp.,* 202 Kan. 712, 718, 452 P. 2d 279.

A cardinal rule in the construction of contracts is to ascertain the intention of the parties and to give effect to that intention. *(Springer v. Litsey,* 185 Kan. 531, 345 P. 2d 669.) It is also a well recognized legal doctrine that where the terms of a written instrument are clear and unambiguous the intent of the parties expressed thereby is to be determined from a consideration of the instrument itself, in its entirety. *(Brungardt v. Smith,* 178 Kan. 629, 290 P. 2d 1039.) On the other hand, where the language in which the parties have expressed themselves leaves their intention doubtful or unclear either because of the terms which are used or the manner of their

arrangement, the instrument must be said to be ambiguous, in which case the facts and circumstances surrounding its execution become competent as to which one of two or more meanings was intended. (17 Am. Jur. 2d, Contracts, § 242, p. 627; *Lawrence v. Cooper Independent Theatres,* 177 Kan. 125, 276 P. 2d 350.)

We have combed the lease agreement in vain to discover that degree of clarity which to us denotes unambiguity. The phraseology found in paragraph 12, the terms and the language employed therein, and the general arrangement of the words and phrases give us genuine pause as to what the parties actually intended as to payment of ad valorem taxes. In 30 Am. Jur. 2d, Evidence, § 1069, pp. 210, 211, the text recites:

". . . Written words may have more than one meaning, and while parol evidence will not be allowed to change a 'plain meaning,' it may be used to eliminate a doubtful one. . . ."

While we respect the views and opinions of eminent counsel, we are not bound by agreement on their part that the lease is unambiguous with respect to ad valorem taxes. Whether ambiguity exists in an instrument is a matter of law to be decided by the court. (30 Am. Jur. 2d, Evidence, § 1069, p. 211; see, also, Mr. Justice Schroeder's concurring opinion in *Weiner v. Wilshire Oil Co.,* 192 Kan. 490, 500, 389 P. 2d 803.) Points of law pertaining to a case are to be determined judicially whether or not the parties litigant may be in agreement thereon. *(In re Estate of Maguire,* 204 Kan. 686, 466 P. 2d 358; *Urban Renewal Agency v. Reed,* 211 Kan. 705, 508 P. 2d 1227 this date decided.)

Having determined that ambiguity inheres in the contract, it follows we are constrained to hold the trial court erred in entering summary judgment on the ground that the lease was not ambiguous, but that the intent of the parties could be ascertained without resort to extrinsic evidence.

The law is well settled that where ambiguity exists in a document evidence is admissible as an aid to its interpretation. (30 Am. Jur. 2d, Evidence, § 1069, pp. 210, 211.) Especially may resort be had to the parties themselves. In *Berg v. Scully,* 120 Kan. 637, 245 Pac. 119, it was held:

"Parties to a contract know best what was meant by its terms, and are the least liable to be mistaken as to its intention, and, where the contract is silent or ambiguous concerning a vital point incident thereto, parol evidence will be received to aid in its construction." ( Syl. ¶ 2. )

To similar effect, see *Mayse v. Grieves*, 130 Kan. 96, 100, 285 Pac. 630; *Mosher v. Kansas Coöp Wheat Mkt. Ass'n.*, 136 Kan. 269, 274, 15 P. 2d 421; *Oliver v. Nugen*, 180 Kan. 823, 829, 308 P. 2d 132; *Souder v. Tri-County Refrigeration Co.*, 190 Kan. 207, 373 P. 2d 155.

Our cases appear to accord with the rule which prevails generally in this country. In 17 Am. Jur. 2d, Contracts, § 261, p. 665, we find this language:

". . . In the construction of an ambiguous or uncertain writing which is intended to state the entire agreement, preliminary negotiations between the parties may be considered in order to determine their meaning and intention and to ascertain in what sense the parties themselves used the ambiguous terms in the writing which sets forth their contract. . . ."

Where there is ambiguity in a written contract and extrinsic evidence is required to ascertain the intention of the parties, summary judgment should not be entered in the face of contradictory or conflicting evidence. Not long after the Kansas Code of Civil Procedure took effect this court held in *Brick v. City of Wichita*, 195 Kan. 206, 210, 403 P. 2d 964, that where there exists a good faith dispute concerning the facts, the parties to a lawsuit are to be accorded a trial at which evidence may be presented and the facts determined. It was said that summary judgment should not be entered upon motion of the defendant except where he is entitled to judgment beyond all doubt and only where the conceded facts show the defendant's rights with such clarity as to leave no room for controversy.

In the present action the district court had before it, when summary judgment was entered, the pretrial depositions of Messrs. Hill and Webster and Mr. and Mrs. Kurata. Their depositions were highly conflicting as to what had been said or talked about during the course of negotiations. Also before the court was an affidavit given by the attorney who had prepared the lease, at the behest of all the parties, and which the court had admitted over the plaintiff's objection. The affidavit purported to sustain the Kuratas' view of what had been intended by the parties and it related an alleged statement by Mr. Hill, which the affiant concedes Hill and Webster presently deny, that they would pay the taxes on the improvements. The attorney's affidavit directly conflicts with the deposition testimony of both Hill and Webster which was to the effect that during the negotiations Fred Kurata said he would pay the taxes; that Kurata's statement came after Webster had calculated what the additional taxes would be; and that both

Kurata and the attorney indicated the ad valorem taxes would cover the assessment on the real estate and the improvements. We believe a sharp dispute of fact existed, despite the trial court's contrary finding.

It is true that a supplemental journal entry was filed November 17, 1971, five and a half months after the original journal entry was filed and long after plaintiff's motion for new trial had been filed and argued, in which the trial court recited that *if* it had found the lease ambiguous and *if* it had admitted parol evidence, even then the depositions of the signatories to the lease "did not controvert the admissible factual statements in the affidavit" of the attorney. The court further recited in the second journal entry that *if* parol evidence had been admitted "there was no genuine issue as to any material fact and . . . the defendants were entitled to judgment as a matter of law."

Despite this supplemental document, we remain of the opinion that genuine issues of fact were, and still are, present to be resolved. It is apparent that the trial court, in arriving at the conclusion there were no disputed factual issues, gave considerable, if not controlling, weight to what was set out in the attorney's affidavit, with respect to which the plaintiffs should have been afforded an opportunity to confront the affiant and subject him to cross-examination.

We conclude this case should not have been determined on a summary basis. Accordingly, the judgment is reversed with directions to proceed in accordance with the views here expressed.

FROMME, J. not participating.