(640 P.2d 343)

No. 52,464

KANSAS STATE BANK & TRUST COMPANY, *Appellee,* v. JOHN Z. DELOREAN, *Appellant.*

Petition for review denied May 21, 1982.

Opinion filed February 11, 1982.

*Paul B. Swartz,* of Martin, Pringle, Fair, Davis & Oliver, of Wichita, for the appellant.

*Thomas D. Kitch* and *Paul R. Kitch,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for the appellee.

Before Foth, C.J., presiding, Terry L. Bullock, District Judge, and Frederick Woleslagel, District Judge Retired, assigned.

Bullock, J.: John Z. DeLorean appeals from a judgment of the district court which found him liable, as guarantor, for certain corporate debts of Dahlinger Pontiac-Cadillac, Inc. to the Kansas State Bank and Trust of Wichita. The evidence introduced at the bench trial was extensive and conflicting, ultimately resulting in the entry of 79 findings of fact and 58 conclusions of law by the trial court. Highly summarized, the factual background necessary for a determination of the issues raised on appeal follows.

DeLorean, a New York inventor-investor-entrepreneur and former vice-president of General Motors, contacted the Bank in 1976 expressing his interest in acquiring controlling interest in one of the Bank's corporate customers, the financially troubled Dahlinger automobile dealership. Thereafter, DeLorean sent his agent, Roy Nesseth, to investigate Dahlinger's financial condition. After concluding this investigation, Nesseth commenced negotiations with the owners of Dahlinger. Eventually, DeLorean's personal attorney, Thomas Kimmerly, assisted in closing the resulting sale, wherein 25% of the Dahlinger stock re-

mained with Jerry Dahlinger and 75% was transferred to Nesseth and Kimmerly. Although DeLorean held no stock in his name, J. V. Lentell, the Bank's president, understood, and the trial court found, that DeLorean was the "financial power" behind the purchase. Consistent with this understanding, DeLorean's December 31, 1976, personal financial statement revealed an equity investment in a "Pontiac-Cadillac dealership in Wichita, Kansas" in the amount of $200,000.

In order to obtain credit from the Bank for this newly acquired dealership, DeLorean personally guaranteed the Dahlinger floorplan loan, a Dahlinger promissory note and a $385,000 loan made by the Bank to the John Z. DeLorean Corporation (a separate corporation, wholly owned by DeLorean). Notwithstanding these infusions of credit, by the late summer of 1977, Dahlinger was once again experiencing financial difficulty. In fact, it was at this time that the Bank notified Dahlinger and DeLorean it would no longer honor overdrafts on the corporate checking account. As a result of these developments, the DeLorean interests decided to sell the troubled dealership, if a buyer could be found. In due course, a group of Texas investors became interested, but only on the condition that DeLorean could first purchase and then lease to them the land on which the Dahlinger place of business was located. In order to satisfy this condition, DeLorean needed another loan.

On Sunday, September 11, 1977, a meeting was held at the offices of the Bank for the purpose of discussing the financial condition of Dahlinger and the terms of the prospective sale of the dealership. On that date, the total Dahlinger indebtedness to the Bank, including both principal and interest, was in the approximate amount of $700,000. In addition, the $385,000 loan to DeLorean's own corporation was in default. At this meeting, predictably, the Bank indicated its desire to both protect and recover its investments and, at the same time, avoid the difficulty and expense connected with foreclosure. On the other side of the conference table, the DeLorean interests desired to obtain additional monies for several purposes, including the purchase of the real estate in question. Consistent with its objectives, the Bank proposed to loan DeLorean $1,350,000 for 20 years at 5% and to loan the continuing Dahlinger corporation the sum of $250,000 on identical terms. The purpose of the loan to DeLorean, pro-

posed by the Bank, was to provide $850,000 for the purchase of the subject real estate and an additional $500,000 to be held in escrow to assure the payment of that part of the remaining Dahlinger indebtedness to the Bank not covered by the new $250,000 loan. The remarkably favorable terms of the proposed loans, both as to time and interest rate, were the Bank's concessions to the obvious financial difficulties of its borrower and were expressly offered by the Bank in an effort to avoid foreclosure.

In response to the Bank's proposal, DeLorean expressed interest in the loans, but on different terms. His proposal was that the "extra" $500,000 be released to him for his own use, the Bank being required to look to Dahlinger and its assets for the repayment of the balance of the Dahlinger indebtedness. The Bank would not agree to DeLorean's terms. Accordingly, a compromise was struck whereby the Bank loaned Dahlinger the sum of $250,000 and loaned DeLorean the sum of $1,350,000, both loans being for 20 years at 5% and on conditions which follow. The DeLorean loan was disbursed as agreed: $850,000 for the real estate purchase, $385,000 to pay off the delinquent DeLorean Corporation loan and $115,000 to DeLorean in cash. In exchange for these loans, DeLorean agreed to guarantee up to $450,000 of the remaining Dahlinger indebtedness (a sum slightly in excess of the principal and interest then due on the total Dahlinger debt to the Bank, after first subtracting the new loan to Dahlinger). The parties specifically agreed that the Bank would have no further obligation to liquidate the Dahlinger pledged collateral but, if Dahlinger did so, any proceeds therefrom, actually paid to the Bank, would reduce DeLorean's guaranty "dollar for dollar." The clear intent of the parties, reflected throughout the trial court's extensive findings and conclusions, was that DeLorean's guaranty would ultimately assure the Bank full payment of the remaining Dahlinger indebtedness to the same extent that the Bank would have been paid if the additional $500,000 had been escrowed and applied to those debts on September 11, as the Bank originally proposed.

On September 12, 1977, Kimmerly, DeLorean's attorney, prepared and executed, as DeLorean's attorney-in-fact, a written guaranty intended by the parties to reflect their agreements made the prior day. The terms of that agreement are as follows:

"September 12, 1977
To THE KANSAS STATE BANK AND TRUST COMPANY
WICHITA, KANSAS
"In consideration of one dollar, to me paid, receipt of which is hereby acknowledged, the total and absolute release of any and all other guarantees previously made by me on behalf of Dahlinger Pontiac-Cadillac, Inc., (hereinafter styled the 'borrower') and other valuable considerations and of the advances already made to the account of the borrower, I hereby guarantee to you, your successors and assigns, the payment of the principal sum of Four Hundred Fifty Thousand and 00/100 ($450,000.00) Dollars, so advanced, this sum of $450,000.00 here guaranteed is the amount owed to you by the borrower of approximately $700,000.00 less $250,000.00 you have agreed to loan the borrower on a 20 year 5% note and apply against the current due amount of $700,000.00 leaving the $450,000.00 here guaranteed; and I hereby authorize you at any time in such manner and upon such terms as you may see fit, to extend the time for or change the manner or terms of payment of any such sum or sums of money or any part thereof, without notice to me, and I hereby agree that such extension of time for or change in the manner or terms of payment shall not in any way release me from or reduce my liability on this guarantee.
"This guaranty shall be reduced by the amount of any cash, notes, drafts, acceptances, checks, or other evidences of indebtedness as is (sic) commercially acceptable which is (sic) deposited into the account of the borrower, on a dollar for dollar basis. In the event of a voluntary foreclosure on assets, the sum actually received on the sale of such assets shall be the (sic) considered as cash paid and deposited in the account of the borrower.

/s/ John Z. DeLorean
JOHN Z. DE LOREAN
/s/ by Thomas W. Kimmerly, Att'y"

On September 14, 1977, the Bank furnished to DeLorean's agents a summary of all the aforementioned agreements and financial arrangements agreed to on September 11. No objection was ever received by the Bank to this summary and no indication was ever made, until the trial of this action, that the same did not reflect the understanding of the parties.

During the months following the financial transaction previously described, Nesseth continued to run the dealership. With few exceptions, however, he failed to apply the proceeds from the sale of pledged collateral to the Dahlinger bank debt. That Nesseth played "fast and loose" with the assets of the corporation is no longer open to controversy. See *Binyon v. Nesseth,* 7 Kan. App. 2d 110, 638 P.2d 946 (1981). Although the Bank no longer "policed" the Dahlinger floorplan note, consistent with its agreement with DeLorean, it became increasingly suspicious of Nesseth and of his failure to reduce the Dahlinger debt. These suspicions were communicated on several occasions to DeLorean

and his agents and, eventually, on May 18, 1978, formal demand was made upon DeLorean to make good his guaranty. This suit followed on May 30, 1978, Count 1 of the petition stating a cause of action premised on the September 12, 1977, guaranty agreement and Count 2 stating a cause of action on DeLorean's guaranty of an unrelated personal promissory note of Nesseth. The Bank's motion for summary judgment was granted on the second cause of action and no appeal has been taken from that judgment. Count 1 proceeded to trial, resulting in a judgment for the Bank in the amount of $290,409.01, the unpaid amount of the guaranteed portion of the Dahlinger debt, including accrued interest, as of February 25, 1980, together with interest thereafter on the underlying principal sum of $237,124.70 at the rate of $64.97 per day. DeLorean's motion to amend findings and judgment was overruled and this appeal was duly perfected.

1. DeLorean first asserts the trial court erred in its construction of the loan guaranty contract. The particular point of contention is the court's interpretation of the guaranty reduction provision:

"This guaranty shall be reduced by the amount of any cash, notes, drafts, acceptances, checks, or other evidences of indebtedness as is commercially acceptable which is deposited into the account of the borrower, on a dollar for dollar basis."

The thrust of DeLorean's argument on this issue is that the amount of the judgment against him should have been reduced by certain deposits made in the Dahlinger *checking* account subsequent to September 11, 1977, albeit those sums were never actually received by the Bank as a creditor or credited against the Dahlinger indebtedness. The Bank on the other hand contends the "account" referred to in the agreement is the "loan liability ledger" account which reflects payments actually made on the loan.

The trial court found the contract unambiguous and held "defendant's liability would be reduced by the amounts (other than the new loan to the borrower) that were credited to the 'formal record' of the borrower's indebtedness [the Bank's liability ledger] . . . subsequent to the execution of the guaranty."

We begin our inquiry by examining the question of ambiguity which is a matter of law to be decided by the court. *First National Bank of Hutchinson v. Kaiser*, 222 Kan. 274, 278, 564 P.2d 493

(1977); *Mobile Acres, Inc. v. Kurata,* 211 Kan. 833, 839, 508 P.2d 889 (1973), *Robertson v. McCune,* 205 Kan. 696, 700, 472 P.2d 215 (1970). "On appeal we have the same opportunity afforded the trial court to decide the question of ambiguity because the contract is in writing." *Kauk v. First Nat'l Bank of Hoxie,* 5 Kan. App. 2d 83, 87, 613 P.2d 670 (1980). Accord, *In re Estate of Thompson,* 226 Kan. 437, 440, 601 P.2d 1105 (1979); *Keeler Co. v. Atchison, T. & S. F. Rly. Co.,* 187 Kan. 125, 126, 354 P.2d 368 (1960).

A contract of guaranty, like other contracts, is to be construed according to the intention of the parties. *Trego WaKeeney State Bank v. Maier,* 214 Kan. 169, 174, 519 P.2d 743 (1974). Accord, *Mobile Acres, Inc. v. Kurata,* 211 Kan. at 838; *Koerner v. Custom Components, Inc.,* 4 Kan. App. 2d 113, 119, 603 P.2d 628 (1979). Under principles too familiar to require citation, ambiguities in written agreements are uniformly construed against the party who authored the instrument, inasmuch as it is that party who, through due care in drafting, could have wholly prevented the controversy. Where the language of the contract leaves the intent of the parties doubtful or unclear, "the instrument must be said to be ambiguous, in which case the facts and circumstances surrounding its execution become competent as to which one of two or more meanings was intended." *Mobile Acres, Inc. v. Kurata,* 211 Kan. at 839. Accord, *Amortibanc Investment Co. v. Jehan,* 220 Kan. 33, 43, 551 P.2d 918 (1976); *Robertson v. McCune,* 205 Kan. at 699.

The financial relationship of the two parties to this action at the time of the execution of the guaranty on September 12, 1977, is not in controversy. Defendant was the guarantor of indebtedness in excess of $340,000.00 for the financially troubled car dealership, and he was the personal guarantor of a $385,000 loan, then in default, to the John Z. DeLorean Corporation. Against this factual background, the parties entered complex negotiations whereby defendant eventually received a long-term, low-interest loan of $1,350,000.00, which allowed him to purchase property to facilitate sale of the dealership, pay off the DeLorean Corporation indebtedness, and obtain his release from prior Dahlinger guarantees, among other benefits. In return, defendant guaranteed $450,000.00 of Dahlinger indebtedness subject to the reduction provision here in question.

Defendant testified he authorized his attorney to sign the guaranty only after receiving assurances that the Dahlinger assets were sufficient "so I could never be called on to make good on it." Kimmerly testified defendant was willing to participate in the deal to "help the bank out." In keeping with these altruistic motives, defendant's theory is his guaranty was to be reduced by *any* money deposited to the Dahlinger *checking* account. Reviewing the record, we find that the concurrent $250,000.00 Dahlinger loan (already subtracted from the Dahlinger debt in calculating the guaranty amount) was deposited to the checking account, $97,000.00 of which was withdrawn, then redeposited. DeLorean would have us believe the Bank agreed to reduce his net guaranty a second and third time with the Bank's own loan proceeds, deposited not once but twice. Defendant's attorney also directed the Bank to make payments from the checking account to third parties. Again, defendant contends these monies reduce his guaranty.

Reasonable rather than unreasonable interpretations of contracts are favored. "Results which vitiate the purpose or reduce the terms of a contract to an absurdity should be avoided." *Weiner v. Wilshire Oil Co.,* 192 Kan. 490, 496, 389 P.2d 803 (1964); *Geiger v. Eagle-Cherokee Coal Mining Co.,* 181 Kan. 567, 573, 313 P.2d 731 (1957). In construing a contract of guaranty entered into by a financial institution and a sophisticated businessman, we find the reasonable interpretation of their intentions to be that advanced by plaintiff: to reduce the amount of the guaranty as the level of guaranteed indebtedness is reduced, exclusive of any reduction occurring as a result of the concurrent $250,000.00 loan to Dahlinger. While the use of the word "deposited" is troublesome, we conclude, as did the trial court, that reductions in indebtedness as reflected in the loan liability ledger, rather than a deposit to the borrower's checking account, was the intended measuring stick for reducing the amount of defendant's guaranty.

As we have previously noted, the "pole star" in the construction of any contract is the intention of the parties. The record here reflects not only the "circumstances" surrounding the transaction, but it also contains the oral agreements and memoranda indicating what the parties intended and understood the agreement to contain. Those oral agreements and memoranda, properly

admitted to explain the ambiguous document, also make abundantly plain the accuracy of the trial court's interpretation of the agreement. Accordingly, we conclude DeLorean's first contention lacks merit.

2. DeLorean's second contention is that the trial court erred in awarding judgment for amounts not properly within the scope of the guaranty. He specifically challenges the inclusion of pre-demand interest, post-demand interest, and the amount of Dahlinger-spawned garnishments adjudicated and pending against the Bank at the time of the September 11, 1977, agreement.

The difficulty with these contentions, insofar as DeLorean is concerned, is that the trial court found from disputed evidence that the intention of the parties was that these debts be covered by the guaranty. As to interest owing at the date of the guaranty and the garnishment obligations, the memoranda of the parties' understanding, which the guaranty was intended to memorialize, clearly included such sums in calculating the total amount of the Dahlinger debt to be guaranteed by DeLorean. As to interest accruing subsequent to the date of the guaranty but prior to demand, the intention of the parties that the guaranty make the Bank whole to the same extent as if it had been paid on September 11, 1977, controls—despite the parties' use of the ambiguous guaranty term "principal sum" to describe a sum which admittedly contained both principal and interest. Further, DeLorean repeatedly assured the Bank, throughout this period, that he would contact Nesseth and see that Nesseth paid the debt from Dahlinger assets. This conduct on the part of DeLorean clearly caused the Bank to delay its demand. Under such circumstances, DeLorean can hardly be heard to complain when compelled to compensate the Bank for interest accruing during that period.

Turning to the question of post-demand interest, we conclude such interest does not represent an indebtedness of Dahlinger at all, but that it is, rather, a debt of DeLorean himself, properly allowed by the trial court. "[W]hen the debt has matured against the guarantor, the debt is the guarantor's primary obligation and interest may be recovered even though the effect is to increase the judgment beyond the limit of liability stated in the guaranty contract." 38 Am. Jur. 2d, Guaranty § 76, pp. 1082-83.

For all of the reasons stated, we likewise conclude DeLorean's second contention lacks merit.

3. DeLorean's final contention is that the trial court erred in holding the defense of impairment of collateral inapplicable to the guaranty.

A guaranty involves a tripartite relationship based on a contract between two or more persons by which one person promises to answer for the debt of a third person. *Trego WaKeeney State Bank v. Maier,* 214 Kan. at 173; *Bomud Co. v. Yockey Oil Co.,* 180 Kan. 109, 114, 299 P.2d 72 (1956). It can be, by its provisions, a conditional or an unconditional guaranty. The principal distinction between the two lies in the creditor's duty to proceed against the principal obligor before attempting to collect from the guarantor, an obligation imposed by conditional, but not by unconditional, guaranties. *United States v. Willis,* 593 F.2d 247, 254 (6th Cir. 1979). See *Howell v. Ablah,* 188 Kan. 244, 250, 361 P.2d 872 (1961). Uniform Commercial Code terminology recognizes comparable categories of negotiable instrument guaranties, distinguished by whether the words "collection guaranteed" or "payment guaranteed" are added to the signature. K.S.A. 84-3-416.

In the case at bar the trial court found the guaranty to be absolute, unconditional, in form and concluded:

"24. The defendant's allegations of impairment of collateral cannot constitute a defense to the bank's claim because the guaranty being sued upon here is absolute in form."

In our view, the trial court confused two separate and unrelated issues. The form of the guaranty (conditional or unconditional) determines only whether the creditor is required to first proceed against the principal obligor. Separate and apart from that issue is the defense a guarantor may raise in an action against him that part or all of his obligation has been discharged by the creditor's impairment of the collateral. While we agree with the trial court's characterization of this guaranty as absolute or unconditional, we turn now to a closer examination of the impairment of collateral issue.

Appellant argues this action is controlled by the Uniform Commercial Code provision on impairment of collateral, K.S.A. 84-3-606, which provides in pertinent part:

"(1) The holder discharges *any party to the instrument* to the extent that without such party's consent the holder
. . . ."

(*b*) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse." (Emphasis added.)

The italicized language "any party to the instrument" is dispositive of the argument. K.S.A. 84-3-102(1)(*e*) defines "instrument" to mean "negotiable instrument." The document in question is not a negotiable instrument but rather a separate contract of guaranty. Thus, the UCC provision is not applicable. *Ishak v. Elgin Nat'l Bk.,* 48 Ill. App. 3d 614, 363 N.E.2d 159 (1977). We do note in passing, however, that even the UCC impairment provision is not absolute; *consent* may be given before or after impairment and if given, operates as a *waiver* of discharge. See K.S.A. 84-3-606, Comment 2.

Appellant is correct in stating the common-law rule in this as well as other jurisdictions that impairment of collateral by a guarantee discharges the guarantor's obligation *pro tanto. E.g., Withers v. Berry,* 25 Kan. 373, 375 (1881); *Langeveld v. L.R.Z.H. Corporation,* 74 N.J. 45, 50-51, 376 A.2d 931 (1977); 38 C.J.S., Guaranty § 81. There are, however, exceptions to the general rule. One such exception is that a guarantor can consent to lack of diligence in collection or an impairment of collateral and thus waive discharge, much as under the Uniform Commercial Code. We find one early Kansas case particularly persuasive. In *Furst v. Buss,* 104 Kan. 245, 178 Pac. 411 (1919), Furst & Thomas extended credit to one McNitt on the basis of a guaranty signed by Buss and Phillips which provided:

"In consideration of Furst & Thomas extending credit to  .  .  .  Salesman [B. McNitt] we, the undersigned, jointly and severally, guarantee to them the faithful performance of this contract by him, and full settlement according to its terms, for all goods sold to him on credit by them, hereby waiving notice of acceptance and all notice as to the account of said Salesman, and we agree that any extension of time to him shall not release us from liability hereon." 104 Kan. at 246.

An insolvent McNitt defaulted on his contract to pay for the merchandise, and defendants refused to honor their guaranty arguing, among other things, the discharge of their obligation because of plaintiffs' "gross want of diligence" in collecting from McNitt "when if diligence had been used, plaintiffs might have collected from him while he still had funds and property to satisfy his obligations." 104 Kan. at 249. The court found the defense unpersuasive because "the guarantors bound themselves

'that any extension of time to him [McNitt] shall not release us from liability.' So the long delay in bringing suit . . . is insufficient to discharge . . . the defendants." 104 Kan. at 249.

In the case at bar, DeLorean became obligated on a guaranty which provided in part:

"I hereby authorize you at any time in such manner and upon such terms as you may see fit, to extend the time for or change the manner or terms of payment of any such sum or sums of money or any part thereof, without notice to me, and I hereby agree that such extension of time for or change in the manner or terms of payment shall not in any way release me from or reduce my liability on this guaranty."

DeLorean complains specifically that the Bank did not foreclose on secured assets before his unfaithful agent dissipated them. But DeLorean, by the terms of the agreement itself (particularly as explained by the contemporary oral understandings of the parties previously mentioned), relieved the Bank of any obligation to foreclose or to act immediately to collect on the debt. This guaranty and waiver is precisely that which DeLorean gave for the Bank's 5%, 20-year, $1,350,000 loan. DeLorean further complains that the Bank discontinued its regular inventory inspections. The trial court found that DeLorean had not only agreed to this arrangement, but that, in essence, he was in a better position than the Bank to police the collateral inasmuch as his agents were in control of the dealership. We concur.

However desirable it might have been that foreclosure occur at an earlier date or that routine inspections be performed, DeLorean clearly consented to less vigorous debt collection procedures. He cannot now be heard to complain that the collateral for the debt was impaired as a result.

Even though the trial court determined the defense of impairment of collateral was not available to the appellant because the guaranty was *absolute in form* and we determine the defense was not available because appellant *consented* to whatever impairment occurred, we affirm the trial court's ruling. If the judgment of the trial court is correct, it is to be upheld even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision. *Farmers State Bank v. Cooper,* 227 Kan. 547, 556, 608 P.2d 929 (1980); *Chelsea Plaza Homes, Inc. v. Moore,* 226 Kan. 430, 435, 601 P.2d 1100 (1979).

Although "findings not supported by substantial competent

evidence" is not assigned as a formal issue in this appeal, throughout DeLorean's brief and oral argument here, counsel for DeLorean continually referred this court to facts in the record which arguably lead to factual conclusions contrary to those found by the trial court. We concede, in some instances, such exist. The function of this court, however, is not to retry the facts. If the findings of the trial court are supported by substantial competent evidence we are bound thereby, even though the record contains other evidence from which contrary conclusions might have been drawn. From our examination of the entire record in these proceedings we easily conclude that the findings and conclusions of the trial court are amply supported by substantial competent evidence and we cannot disturb them on appeal. *City of Council Grove v. Ossmann,* 219 Kan. 120, Syl. ¶ 1, 546 P.2d 1399 (1976).

Affirmed.