**FARMERS LOAN & TRUST CO.,**
**Appellant–Plaintiff Below,**

v.

**Robert A. LETSINGER, Hulda Anne Letsinger, Farmers Home Administration, and Summit Bank of Clinton County, Appellees–Defendants Below.**

No. 12A02–9211–CV–535.

Court of Appeals of Indiana,
Third District.

June 8, 1994.

Thomas J. Trauring, Robert M. Squier, Jr., Fell, McGarvey, Trauring & Wilson, Kokomo, for appellant.

R.C. Richmond, III, Sommer & Barnard, P.C., Indianapolis, for appellee.

STATON, Judge.

Farmers Loan & Trust Co. ("Bank") appeals from a judgment denying its recovery on promissory notes guaranteed by Robert and Hulda Anne Letsinger ("Robert" and "Anne", collectively "Letsingers") after the primary obligor on the notes declared bankruptcy. The Bank presents three issues for our review, which we restate as follows:

I.   Whether the trial court erred in determining that the Letsingers were accommodation parties.

II.  Whether the trial court erred in finding that the Letsingers' signatures on certain promissory notes did not waive their suretyship defenses.

III. Whether the Letsingers' execution of a separate guaranty subjected them to unlimited liability for the corporation's debts.

The facts most favorable to the judgment reveal that Robert and Anne, along with their two daughters and a son-in-law, were the sole shareholders in a corporation known as T–C Crop Care, Inc. ["T–C"]. The corporation engaged in the fertilizer business. On November 21, 1982, the Bank loaned T–C Crop Care $32,998.39. A promissory note reflecting the loan was executed at that time,

which note gave the Bank a security interest in all of T–C's plant, buildings, fixtures and equipment, as well as all additions, accessions, accessories, and replacements thereto. The note also granted the Bank a first lien and security interest in T–C's accounts receivable and inventory then owned or thereafter acquired and all products and proceeds thereof. The promissory note was signed by the Letsingers in their capacities as officers of T–C, and also in their individual capacity. On December 31, 1982, the Letsingers executed a separate guaranty on the loan, and later gave the bank mortgages on two houses as additional security for their guaranty.

Over the next several years, additional Bank notes were executed on several occasions. These notes indicated T–C as borrower and were signed by Robert in his capacity as vice president or by Lynn Humberg, T–C's secretary. In early 1985, T–C granted a second lien and security interest in the same corporate property and assets to Erny's Fertilizer Service, Inc. ("Erny's"), which lien was duly perfected. Although this lien was originally subordinate to the lien held by the Bank, it gained priority after the Bank's security interest expired in 1988 because the Bank failed to re-file a financing statement or to file a continuation statement.

In February 1989, after the Bank's priority lapsed, the Letsingers executed several renewal notes and a new guaranty for T–C's debt to the Bank. Although the Bank was aware of the lapsed security interest, the Bank did not inform the Letsingers that the collateral had been impaired. The new promissory notes contained a waiver of defenses which purported to prevent the Letsingers from utilizing the defense that the Bank's actions impaired the original security for the loan.

On March 31, 1989, T–C filed for bankruptcy. The bankruptcy court ordered T–C to liquidate assets to pay its creditors, the majority of which proceeds went to Erny's based on its first priority security interest. The Bank received a total of $34,163.19 in proceeds and accounts from T–C in satisfaction of the promissory notes. The Bank initiated this action to recover a deficiency of $115,554.41 from the Letsingers.

## I.

### Status as Accommodation Parties

The Bank challenges the trial court's determination of the Letsingers' status as accommodation parties on two bases. First, the Bank asserts that the trial court incorrectly applied the law to determine accommodation status. Second, assuming that the trial court correctly applied the law, the Bank argues that the evidence does not support the determination in Letsingers' favor.

■ Indiana law defines an accommodation party as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." IND.CODE 26–1–3–415(1) (1988). Whether a co-maker is an accommodation party on a promissory note is a question of fact. *Williams v. Lafayette Production Credit Ass'n* (1987), Ind. App., 508 N.E.2d 579, 582. In making this factual determination, the reason the party signed the instrument is controlling. *Id.* Moreover, the entire series of transactions between the parties, viewed as a whole, may be examined by the fact finder in order to determine accommodation status. *Stockwell v. Bloomfield State Bank* (1977), 174 Ind. App. 307, 310, 367 N.E.2d 42, 45 (overruled in part on other grounds, *Farner v. Farner* (1985), Ind.App., 480 N.E.2d 251).

■ The Bank challenges the trial court's application of the above legal standard, alleging that the court failed to consider the reason the Letsingers signed the notes. Instead, the Bank argues that the court erroneously limited its consideration to only one factor, whether the Letsingers directly benefitted from the transaction, in reaching the conclusion that the Letsingers were accommodation parties.

An examination of the trial court's findings reveals otherwise. The findings reveal that although the trial court did consider whether the Letsingers directly benefitted from the transaction, this was only one of the factors considered. Additional factors listed by the court include: 1) prior to 1989, subsequent renewal notes were executed by Robert only in his capacity as vice president of T–C; 2)

Anne was not required or even requested to sign any renewal notes prior to 1989; 3) only T–C was listed as borrower on renewal notes; 4) in 1989, upon execution of additional renewal notes, the Letsingers were instructed to sign a new guaranty; and 5) the Bank's file summary sheet, generated after the Letsingers executed additional renewal notes in 1989, listed T–C as the primary borrower and the Letsingers as co-signers. These findings support the conclusion that the trial court properly considered the relevant attendant circumstances in reaching the determination that the Letsingers acted as accommodation parties. We find no error here.

The Bank also challenges the trial court's determination of the Letsingers' status as unsupported by the evidence. Because the trial court entered factual findings pursuant to Indiana Trial Rule 52(A), we examine the Bank's evidentiary challenge under a limited standard of review. We cannot set aside the findings or judgment of the trial court unless clearly erroneous. Ind.Trial Rule 52(A). Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Vandenburgh County Board of Commissioners v. Rittenhouse* (1991), Ind.App., 575 N.E.2d 663, 665, *tr. denied.* When determining whether the findings or judgment are clearly erroneous, we consider only the evidence most favorable to the judgment and the reasonable inferences flowing from that evidence. *Id.* We will not judge credibility or reweigh the evidence. *Id.*

The Bank challenges the following specific finding entered by the trial court:

11. In or about late February 1989, the Notes were executed to renew the Loans. Robert executed the Notes on behalf of T–C as vice-president. Letsingers were also instructed to sign the Notes and did sign the Notes individually. The Notes, which were prepared by the Bank, show the "borrower" as T–C, not Letsingers. The Notes were renewal notes; no additional funds were loaned, and Letsingers did not receive any proceeds from the Loans evi-

denced by the Notes. Thus, T–C received the direct benefit of the renewal, while any benefit to Letsingers as shareholders was indirect. Contemporaneously with their execution of the Notes, Letsingers were also instructed to sign and did sign a new guarantee [sic]. A "File Summary Sheet" generated by the Bank after the Notes were executed shows T–C as the "Primary Borrower" and Letsingers as "Co–Signers." Based on these factors, the Court finds that Letsingers signed the Notes as accommodation parties, *i.e.* to lend their names to another party to the Notes, namely, T–C.

Record, p. 530.

Our examination of the record reveals that this finding is amply supported by the evidence. At trial, the notes executed with the Bank listed as borrower and Letsingers listed as guarantors were admitted into evidence, as were the additional guaranties executed by the Letsingers in 1982 and 1989. The Bank's file summary sheet, again listing T–C as borrower and the Letsingers as co-signers, was also admitted into evidence. Testimony of both Robert and Anne revealed that they did not receive any direct proceeds from the loan, nor did T–C receive additional funds from execution of the renewal notes. Although the Bank requests that we do so, our standard of review does not permit us to reweigh the credibility of this evidence or the inferences to be drawn therefrom. This evidence sufficiently supports the trial court's findings and judgment.

## II.

### *Promissory Notes*

Once a party is determined to be an accommodation party as defined in I.C. 26–1–3–415(1), that party is considered a surety, and is entitled to the defenses provided in IND. CODE 26–1–3–606 (1988).[1] Relevant to this appeal is the impairment of collateral defense, which provides:

---

1. IND.CODE 26–1–3 *et seq.* was repealed in its entirety by P.L. 222–1993, Sec. 58, effective July 1, 1994. Its provisions remain in effect for purposes of this appeal.

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

\* \* \* \* \* \*

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

I.C. 26–1–3–606(1)(b).

■ The Bank's failure to file continuation statements relegated its security interest in T–C's assets to second priority behind Erny's perfected security interest, thus unjustifiably impairing the Bank's collateral. *White v. Household Finance Corp.* (1973), 158 Ind. App. 394, 403–404, 302 N.E.2d 828, 835. The Bank argues, however, that the Letsingers waived this defense by signing promissory notes containing a consent to release of collateral provision in both 1982 and 1989. This argument relies on this court's decision in *Carney v. Central National Bank of Greencastle* (1983), Ind.App., 450 N.E.2d 1034, *tr. denied,* in which we stated that " 'an express statement of consent incorporated in the instrument is effective against the surety.' " *Id.* at 1037 (quoting WHITE AND SUMMERS, UNIFORM COMMERCIAL CODE § 13–15, at 527.) The Bank's standard form promissory note contained the following express statement of consent:

> Obligations Independent—I understand that my obligation to pay this note is independent of the obligation of any other person who has also agreed to pay it. You may release any of us, *release any security,* waive any right you might have against any of us, extend new credit to any of us, renew this note, or all of the above, without affecting my obligation to pay the loan amount.

Record, p. 579 [emphasis added]. The record indicates that when T–C obtained its first loan in November of 1982, the Letsingers signed a promissory note in their individual capacities containing identical language.

**2.** T–C Crop Care obtained numerous loans from the Bank during the relevant time period. However, prior to the Bank's impairment of collateral, the Letsingers only signed in their individual capacity on the November 21, 1982 loan. Thus

The Bank now argues that this provision allowed it to release or impair the security for all *subsequent* loan transactions between the parties, including the Letsingers individually. This would effectively waive the impairment of collateral defense altogether. Although this argument might have merit if the note at issue had been renewed in each subsequent transaction, the record contains no evidence of its renewal. It was executed by the Letsingers on November 21, 1982 and matured on February 24, 1983. By its own terms, the note had to be paid at maturity unless it was renewed by a subsequent transaction. The Bank's trial exhibits do not indicate renewal of any loan transaction between the parties until June 29, 1983, several months after the first note matured and after the initiation of several additional loans. This evidence supports the inference that the November 1982 note was paid upon maturity. Accordingly, its waiver provision could not remain in binding effect for later loan transactions.[2]

The Bank's only remaining argument that the Letsingers were bound by a consent to impairment provision in the promissory notes depends on those which they signed in their individual capacity on February 13, 1989, *after* the impairment of collateral occurred. In this regard, the trial court concluded:

> Letsingers did not consent to the Bank's impairment of collateral by signing the [1989] Notes. The language on which the Bank relies contemplates consent to a future act or omission by the Bank and, at the time Letsingers signed the Notes and other documents, the Bank had already impaired the collateral. A surety is a favorite in the law, and as such is entitled to a strict construction of the contract in his favor and to have any ambiguity in the contract construed against the party who employed the language and prepared the contract. Furthermore, Letsingers could not have validly consented to the Bank's prior impairment of the collateral because any such consent was not given by the

it is only from the November 21, 1982 transaction that the Letsingers could have been individually bound by the consent to impairment provision that was standard in all of the promissory notes.

Letsingers with full knowledge of the facts. [Citations omitted.]

Record, p. 535.

The Bank does not challenge the legal bases for this conclusion, rather it argues that in reaching it, the court did not consider all of the transactions between the parties. Had the court done so it would have applied the consent provision in the 1982 promissory note and rejected the Letsingers' reliance on the impairment of collateral defense. Our determination that the 1982 promissory note did not bind subsequent loans renders this argument meritless. The evidence presented at trial amply supports the conclusion that the Bank failed to obtain a valid consent to impairment. As a result, the trial court properly applied I.C. 26–1–3–606(1)(b) to defeat the Bank's claim.

## III.

### *Separately Executed Guaranty*

■ In its findings, the trial court acknowledged that the Letsingers executed a separate guaranty on T–C's behalf on December 31, 1982. The terms of that guaranty provided that the Letsingers assumed personal liability for T–C's present and future financial obligations to the Bank, but did not contain a provision consenting to the Bank's impairment of collateral. The Bank now contends that the separate guaranty creates unlimited personal liability for the Letsingers, and that the impairment of collateral defense does not release them from liability because I.C. 26–1–3–606(1)(b) only applies to negotiable instruments, and not to guaranties.

While it is true that I.C. 26–1–3–606 only applies to negotiable instruments, it does not follow that the impairment of collateral defense is limited to use under this section. In fact, I.C. 26–1–3–606 is the codification of suretyship principles [3] in the specific context of negotiable instruments. Such codification does not supplant otherwise applicable common law principles of suretyship.[4]

This court has previously analogized the suretyship principles outlined in the Indiana Uniform Commercial Code when addressing a guarantor's liability under a separately executed guaranty. In *Carney, supra,* this court addressed the enforceability of a consent to impairment of collateral clause in a guaranty document. *Id.* at 1036, In so doing, this court equated a guarantor to a surety under IND.CODE 26–1–1–201(40), and went on to reiterate the general rule that a surety is released when the creditor impairs the collateral without the surety's consent. The court concluded in light of these principles that a consent to impairment provision incorporated in the separate guaranty operated as a valid waiver of the guarantor's impairment defense. *Id.* at 1036–1037.

■ We find *Carney* instructive on the applicability of the impairment of collateral defense to non-negotiable instruments such as a guaranty contract, and conclude that the trial court properly utilized the defense to release the Letsingers from liability in this case. We recognize that in so doing we are declining to follow decisions from a small number of jurisdictions which hold that a continuing guarantor cannot rely on the impairment of collateral defense.[5] We believe

---

**3.** The relevant suretyship principle has been applied to guaranties as follows:

> The general rule is that the surrender or release of any security held by a guarantee [sic] against the indebtedness guaranteed, or any impairment, misapplication, or improper dealing therewith by him, discharges the guarantor to the extent to which he is injured thereby....

38 C.J.S. Guaranty § 81, at 1250 (1943). *See also Kansas State Bank and Trust Co. v. DeLorean* (1982), 7 Kan.App.2d 246, 640 P.2d 343, 351 (common law impairment of collateral defense discharges a guarantor who is otherwise liable under a continuing guaranty agreement, even though the guaranty is not a negotiable instrument covered by the U.C.C.)

**4.** IND.CODE 26–1–1–103 (Supp.1992) provides that unless the common law was expressly displaced by a particular provision of the Code, it remains in full force and effect.

**5.** *See, e.g., Union Planters National Bank of Memphis v. Markowitz* (1979), W.D.Tenn., 468 F.Supp. 529, 535; *First City Bank v. Air Capital Aircraft Sales* (1987), 10th Cir., 820 F.2d 1127, 1135. The Bank cites additional cases in support of its argument, including *City National Bank of Murphysboro v. Reiman* (1992), 236 Ill.App.3d 1080, 175 Ill.Dec. 919, 601 N.E.2d 316 and *Ishak v. Elgin National Bank* (1977), 48 Ill.App.3d 614, 6 Ill.Dec. 630, 363 N.E.2d 159. However, these cases are inapplicable to the case at bar in that they limit their examination to the impairment of

that by allowing a guarantor to avail himself of the suretyship defenses, we reinforce the guarantor's traditional position as a favorite in the law. *Goeke v. Merchants Nat'l Bank and Trust Co.* (1984), Ind.App., 467 N.E.2d 760, 769, *tr. denied.* This interpretation does not unreasonably infringe on the rights of creditors, because a creditor may protect himself from a guarantor's impairment of collateral claim by adding a consent to impairment provision to the guaranty similar to the one upheld in *Carney, supra.*

In the instant case, the Bank did not include a consent to impairment provision in the guaranty personally executed by the Letsingers. As a result, the Letsingers could properly claim that the Bank's failure to maintain its security interest in T–C's collateral unjustifiably impaired the collateral and released the Letsingers from their obligation on the guaranty. Accordingly, we find no error in the trial court's judgment.

Affirmed.

GARRARD and SULLIVAN, JJ., concur.

collateral defense codified in each state's U.C.C, and do not address its common law counterpart    at all.